In the Matter of A.S., an alleged deprived child.

Shonya SANDERS, Appellant,

v.

STATE of Oklahoma, Appellee.

No. 72927.

Court of Appeals of Oklahoma, Division No. 2.

May 14, 1991.

Jack F. Tracy, Purcell, for appellant.

Gary Barger, Asst. Dist. Atty., Purcell, for appellee.

Larry Bonnell, Purcell, for A.S.

BRIGHTMIRE, Judge.

Challenged in this deprived child proceeding is the trial court's redispositional order denying the natural mother's request for court-appointed standards of conduct. We hold that denial of the request was error, vacate the order and remand for further proceedings.

I

The operative facts are these. On April 14, 1988, the appealing mother, Shonya Sanders, was voluntarily admitted to the Oaks Psychiatric Center for in-patient treatment of her "suicidal ideation, depression, helplessness and hopelessness" following an attack and rape by her estranged husband. At the time, she was the mother of three children, ages four-and-one-half years, two years, and ten months. The two older children were placed in the custody of their maternal grandparents in Oklahoma County. The youngest child, A.S., was taken by Dorothy and Leon Lampkin, her maternal aunt and uncle in McClain County, Oklahoma.

On April 22, 1988, a petition was filed in McClain County alleging that A.S. was deprived because:

"The mother of said child is currently in in-patient psychiatric hospitalization. Further, said mother has a long history of mental ilness [sic] and said mental illnes [sic] renders the said mother incapable of carring [sic] for said child. Further, the father of said child is not afit [sic] and proper care taker for said child."

The Department of Human Services (DHS) acceded to the Lampkins' temporary custody of the child pending an adjudicatory hearing.

The adjudicatory hearing took place June 14, 1988. The mother stipulated to the allegations in the petition, A.S. was declared to be deprived, and she was made a ward of the court. It was agreed that custody should remain with the Lampkins pending an August 17 dispositional hearing.

During this period of time, the mother's treatment seemed to be progressing well. Medical doctors specializing in psychiatry, who were treating the mother, had reported in May 1988 that her "mental condition is of crisis nature rather than a long-term chronic condition [and] with proper outpatient care ... the prognosis is favorable in terms of her personal mental health and ability to care for her children." Later, in June 1988, another psychiatrist conducting the outpatient treatment reported that the mother "has shown good compliance in psychotherapy [and] has been very responsible in keeping her appointments and in effective utilization of her sessions."

In the meantime, DHS had implemented a service plan and monitored the mother's compliance with standards of conduct established by the court in Oklahoma County with regard to the two older children. And, as we shall shortly see, the mother appears to have made considerable progress in complying with the standards.

And so it was that at the August 17 dispositional hearing in McClain County, the court was informed by DHS that the mother had completed the Oklahoma County service plan. The results were thought by the Oklahoma County caseworker to be quite gratifying. She reported "that placement in the home [was] appropriate for the two older children" and in fact they had been "placed back in the home of the natural mother on 8–10–88." Surprisingly, however, the McClain County caseworker, without any personal knowledge of the mother's situation in Oklahoma County and without alluding to or relying on any other factually supported basis, simply stated that in his opinion, "placement of [A.S.] in the home of the natural mother is inappropriate at this time."

The only other evidence before the court was the earlier (May 1987) psychological evaluation of the mother by a psychologist with a Ph.D. degree and an psychology intern with a B.S. degree—an evaluation apparently made during a previous DHS proceeding involving the father's abuse of the oldest daughter. In it the mother is

described as "very cooperative and pleasant throughout the testing." The test results revealed "[b]orderline" intelligence "exceeding approximately 4% of the general population." The mother's strengths were identified as "short term memory and social judgment" and her weaknesses as "range of knowledge and language development." The report somewhat fuzzily concluded that the mother is:

> "a woman of borderline intelligence who presents a chronic, marginal schizoid adjustment pattern. High levels of repression and meager internal resources suggest a poor prognosis for change. This personality pattern would make adequate parenting challenging for Ms. Sanders."

Notwithstanding the more recent, and more favorable, evaluation of the mother by the medical doctors specializing in psychiatry, the trial judge reverted to the earlier quoted language of the 1987 psychologists' evaluation. Then, after declining to grant the mother's request to set up a standards-of-conduct goal or service plan study [1] the trial judge found that "parental bonding with the aunt has occurred whereas no bond exists with the mother because of the personality of the mother"—a finding unsubstantiated by any credible evidence. It was upon the basis of these findings that the trial court concluded that the best interest of the child would be served by continuing custody with the McClain County relatives.

Later, on March 10, 1989, at a redispositional hearing the court was advised in a "report"—which had been filed by the mother prior to the hearing—that "Oklahoma County has dismissed all actions against her" and that with the assistance of her family, the mother's life had stabilized and that she was properly caring for the two children in her custody. Based on this evidence, the mother requested the court to (1) transfer the case to Oklahoma County "where she has more opportunity to comply with any [service] plans ... and so that there can be in-home visitation su-

pervised by that department," or in the alternative, (2) grant her previously denied request for "a service plan that would allow her to regain custody of her child," and (3) reassign custody of A.S. to her grandparents in Oklahoma County in keeping with the preferential order prescribed by statute.

The only other evidence presented at this hearing was the testimony of an Oklahoma County caseworker who testified that prior to the adjudication of A.S. as deprived, DHS began receiving complaints from the Lampkins and other family members regarding the mother's care of her children. The caseworker reported, however, that during her random home visits the home was clean and well stocked, and the children were well fed. She further testified that although she had had no contact with A.S. since the latter was placed in the custody of the Lampkins, she did know that the older children had been returned to the custody of the mother. It is significant that *no evidence was introduced by the McClain County DHS personnel on behalf of the Lampkins.* Moreover, in spite of substantial and uncontradicted testimony regarding the considerable progress the mother had made as a result of her ongoing psychotherapy, *no updated psychological evidence from the therapist was requested by the court.*

At the conclusion of the redispositional hearing, the trial judge again apparently ignored the latest psychiatric evidence along with the undisputed evidence of the mother's substantial progress in terms of familial and personal responsibility, independence, and custodial capacity; and once more reverted to the foggy, outdated generalization of the mother's "low intelligence, schizoid adjustment pattern, and meager internal resources." To the latter the trial judge anchored the conclusion that there is a "need for long term foster care placement" of the child. The judge brushed aside the requested alternative of

---

1. The court said: "D.H.S. Service plan to be taken under advisement pending submission [of the] briefs," and the matter would be reviewed later at a February 16, 1989, redispositional hearing. It came to pass, however, that no such briefs were filed and, of course, no service plan was ever devised or implemented.

placing A.S. with the maternal grandparents in Oklahoma County with this observation: "The [Oklahoma County] home of the maternal grandparents is not an appropriate placement for the child because of the 'nervous' condition of the Grandmother." The judge struck from the journal entry a proposed order for implementation of a service plan.

The mother appeals raising issues which may be summarized as follows: (1) The trial court violated her due process rights by failing to establish standards of conduct, compliance with which would enable her to regain custody of her child; (2) The trial court erred in denying her application to transfer the A.S. case to Oklahoma County for DHS supervision and place custody in the maternal grandparents; and (3) The trial court further erred in making findings and conclusions contrary to the law and the clear weight of the evidence.

## II

■ The first question—whether the trial court erred in refusing to provide the mother with court-ordered standards of conduct—we answer in the affirmative.

The mother contends that refusal of her request for a "service plan" advising her of "conditions that must be corrected before [A.S.] may be returned to the home is a violation of the due process rights" guaranteed by both the state and federal constitutions. We agree. It is fundamental that:

"Due process inexorably commands notice which reasonably informs a person that his legally-protected interest may be adversely affected. *Any parent whose child is adjudged to occupy a legal status termed 'deprived' must be judicially advised of those parental conduct norms which he is expected to follow or eschew to recapture a legally encumbered standing as a parent.* The very purpose of these norms is to afford the parent an opportunity to ameliorate his condition and to effectively defend against termination efforts. Judicial no-

tice cannot depend on 'inferences to be gathered from reports of social workers or of medical doctors. It can only be found in written judicially-prescribed norms of conduct to which the parent is expected to conform. Once these norms have been fashioned with clarity, the parent is entitled to the minimum statutory period of three months to conform."

*In re C.G.*, 637 P.2d 66, 68 (Okl.1981) (emphasis added) (footnotes omitted).

In *C.G.*, a case involving the termination of a father's parental rights, the high court emphasized the essentiality of affording parents with procedural due process in proceedings affecting custody or involving termination of parental rights.

The following remarks of the trial judge in the case at bar suggest that he may have misunderstood the statutorily imposed process [2] that was due the mother of A.S., or perhaps thought it should be disregarded. First, the judge said that "this is a situation where service plans don't really address the issues that are involved [because] [y]ou have a severely handicapped mother ... and it's not a question of having her jump through this hoop or that hoop;" and secondly, in advising the mother, that she was required "to do what you can to be, you know, a good noncustodial mother to the child." As will be seen in Part II below, however, such departure from the statutory requirements was impermissible.

■ A basic element of our deprived children statutes is notice to the parents of the conditions which caused the adjudication. Such notice must be followed by affording the parents a reasonable opportunity to correct the conditions. If the parents fail to correct the conditions and the court finds it to be in the child's best interests to do so, termination of parental rights may be considered. It must be remembered, however, that mere failure to correct the conditions which lead to the deprived status is not the only requisite finding for termination of

---

**2.** *See* Delinquent, Dependent and Neglected Children Act, 10 O.S.1981 and Supp.1990 §§ 1101 through 1149.

parental rights in cases involving parents with mental deficiencies.[3]

The statutory scheme requires that once a child has been adjudged to be deprived,[4] the court "shall hold a dispositional hearing" to determine the "best ... interest of the child and the public."[5] And within thirty days "after any deprived child has been placed outside of his home," "[a] placement plan *shall* be filed by the Department with the court."[6] This plan "shall contain" among other things *"[a] description of acts and conduct that would be expected of the parent or parents before the child should be returned home."*[7] It is this DHS plan which is often judicially adopted by the court as its court-ordered standards of conduct. The foregoing statutory commands must be obeyed; the trial court has no discretion in the matter.

■ Here, it appears that the McClain County caseworkers failed to devise, file or request such a plan for the mother. The court erred in proceeding without one. Inclusion in the record of the plan devised by Oklahoma County for the two older children might have helped the court devise a plan for A.S., but it did not cure the adverse legal consequences of omitting one for her.

Thus, to disrupt the biological family with an ongoing separation of indefinite duration without more is at war with the basic intent and purpose of the controlling statutes. Here the trial court's failure to provide the fundamental first step down the statutory path to resolving the status of A.S.—establishing standards of conduct by which to judge the mother's ability to care for the child—has effectively denied the mother of her constitutionally guaranteed right to due process. And to delay implementation of the mother's due process rights until after time-consuming appeals have corrected the error is to cause potentially irreparable harm to the mother and perhaps the child.

The appealed redispositional order is therefore vacated.

## III.

Because we are remanding the cause for further proceedings, it is necessary to comment on other fundamental omissions and deviations in the proceedings below.

Although long-term foster care is statutorily sanctioned in cases involving "exceptional circumstances,"[8] such care can be invoked only after proceeding within the governing statutory framework and complying with statutory requirements.

After a dispositional order has been issued removing a child from the family home, it must be judicially reviewed "at least once every six (6) months until such time as the child is returned to the custody of said parent or parents *and the conditions which caused the child to be adjudi-*

---

3. *See* 10 O.S.Supp.1990 § 1130(A)(8), which provides for termination of parental rights based upon:

"A finding that all of the following exist:
a. the child is deprived as defined in this chapter, and
b. custody of the child has been placed outside the home of a natural or adoptive parent, guardian or extended family member, and
c. the parent whose rights are sought to be terminated has a mental illness or mental deficiency, as defined by paragraphs f and g of Article II of Section 6–201 of Title 43A of the Oklahoma Statutes, which renders the parent incapable of adequately and appropriately exercising parental rights, duties and responsiblities, and
d. the continuation of parental rights would result in harm or threatened harm to the child, and

e. the mental illness or mental deficiency of the parent is such that it will not respond to treatment, therapy or medication and, based upon competent medical opinion, the condition will not substantially improve, and
f. termination of parental rights is in the best interests of the child.
Provided, a finding that a parent has a mental illness or mental deficiency shall not in and of itself deprive the parent of his parental rights."

4. *See id.* § 1114(A).

5. Title 10 O.S.1981 § 1115.

6. *Id.* § 1115.1(A) (emphasis added) (amended by Laws 1989, ch. 339 § 1, eff. June 2, 1989).

7. *Id.* § 1115.1(B)(5) (emphasis added).

8. 10 O.S.Supp.1990 § 1116(B).

cated deprived have been corrected." [9] At such a review hearing, one of the important issues the trial court "should consider" is "whether the child, because of exceptional circumstances, should remain in foster care on a long-term basis as a permanent plan." [10] At *each* review hearing:

> "The Department shall cause to be prepared ... a written report by a qualified child welfare worker *concerning each child who is the subject of such review.* Said report shall include ... a summary of the physical, mental, and emotional condition of the child, the conditions existing in the foster home ... and *any efforts on the part of the parent or parents to correct the conditions which caused the child to be adjudicated deprived.* The report shall specifically recommend, *giving reasons therefor,* whether or not the parental rights of the parent or parents of the child should be terminated and the child placed for adoption, whether or not the child should remain in the foster home ... *and* whether or not the child should be returned to the home from which the child was removed." [11]

In the case under review, not only was the mother denied her fundamental due process right to be advised of the terms and conditions she had to correct in order to regain custody of A.S., but DHS completely failed to comply with even the most basic elements of required evidence.

Pointing up the injustice of not holding the prescribed status reviews in McClain County with regard to A.S. are the results of proper status reviews carried out in Oklahoma County with regard to the two oldest children. There the caseworker reported entirely satisfactory living conditions witnessed by her during random home visits. For some undisclosed reason

the trial judge found this testimony to be "biased and of minimal credibility."

■ The trial court was presented with *no* evidence from DHS personnel in McClain County, either testimonial or written. A "Report to the Court" dated March 10, 1989, appears in the appellate record, but it was not offered as evidence at the hearing. But even if it had been, the report would have been of little value because it says only that A.S. is still placed with her maternal aunt and uncle, and that "Mrs. Sanders has visited on a regular basis with [A.S.]." *It contained none of the statutorily required information.* No other evidence was presented to the court by the McClain County caseworkers, and the court failed to make the required inquiry "as to the nature and extent of casework services being provided the child and parent." [12] On remand, the court is directed to require DHS to perform its statutory duties and then make proper findings as required by statute based on the clear weight of relevant evidence regarding long-term foster care.

### III

The mother's complaint about the trial court's refusal "to transfer this case to Oklahoma County so as to preserve the family unit" also has merit.

■ Such transfers are permissible "[f]or the convenience of the parties and in the interest of justice." [13] The trial court denied the request based on a finding that "the home of the maternal grandparents is not an appropriate placement for the child because of the 'nervous' condition of the Grandmother." This finding is unsupported by competent evidence and therefore rejection of the transfer request on that ground was an abuse of discretion.

9. Title 10 O.S.Supp.1988 § 1116.1(A) (emphasis added) (amended by Laws 1989, ch. 126 § 1, eff. May 1, 1989).

10. Title 10 O.S.Supp.1988 § 1116(B) (as amended).

11. Title 10 O.S.Supp.1988 § 1116.1(B) (emphasis added) (amended by Laws 1989, ch. 126 § 1, eff. May 1, 1989).

12. *Id.* § 1116.1(C).

13. Title 10 O.S.1981 § 1102(A).

At the hearing, the mother testified that she did not own an automobile, but had been able to keep her visitation appointments in McClain County "through my mother and my dad, and my fiance, and my friends." She also testified that "I've only missed about—I'd say, approximately about three visits because I had surgery on my leg."

Not only was there evidence of such inconvenience but the further evidence was that because the mother was in a one-bedroom apartment, she was caring for the middle child and the grandparents were keeping the oldest child so they could take her to and from her day-care school. The grandfather testified that they were willing and able to take custody of A.S., and that by doing so she would be living with her sister, and have ample opportunity to see her brother and mother.

The *only* evidence of the grandmother's " 'nervous' condition" came in the testimony of the custodial aunt when she said that her sister-in-law, the grandmother, "is sick a lot" with "[n]erves, and other physical—I'm not sure what the others are." The grandfather elaborated a bit when he said that the grandmother "has a physical problem of just being a grandmother ... that sees her family being torn apart which brings on nervous reactions," but that she was capable of caring for A.S.

Based on such evidence, and without the benefit of a in-depth DHS home study of the grandparents, the court concluded that: (1) The express statutory order of custodial preference was inapplicable;[14] (2) The grandparents' home was unsuitable; and (3) The mother's request to transfer the matter to the county of her residence should be denied.

■ Court supervision over the custody and welfare of children is equitable in nature,[15] and the findings and judgment of the trial court will not be set aside unless clearly against the weight of the evidence.[16]

Weighing the obvious advantages that proximity would produce in this case with the disadvantages the current custodial arrangement inflicts on the goal of reuniting the family, the trial court's findings with regard to transferring the matter to Oklahoma County appear to be clearly against the weight of the evidence both as to the best interest of A.S. and the convenience of the mother.

Moreover, the evidence suggests that in denying the transfer to Oklahoma County the judge erred in failing to comply with yet another statutory requirement, viz., directing DHS to submit a statement "as to the unavailability or inappropriateness of local placement, or other good cause for any placement more than forty (40) miles from the child's home."[17]

The trial court is directed to rehear the application to transfer the A.S. matter to Oklahoma County and reconsider the question of placing temporary custody of A.S. in the maternal grandparents in accordance with the statutory preference for custodial placement. The transfer of custody to the grandparents appears to be appropriate unless competent evidence is adduced which clearly demonstrates that the maternal grandparents are unfit or unable to temporarily care for A.S.

14. Title 10 O.S.Supp.1990 § 21.1(A), provides in relevant part:

"Custody should be awarded or a guardian appointed in the following order of preference according to the best interests of the child to:
1. a parent or to both parents jointly except as otherwise provided in subsection B of this section;
2. a grandparent;
3. a person who was indicated by the wishes of a deceased parent;
4. a relative of either parent;
5. the person in whose home the child has been living in a wholesome and stable environment; or
6. any other person deemed by the court to be suitable and able to provide adequate and proper care and guidance for the child."

15. *Ex parte Yahola,* 180 Okl. 637, 71 P.2d 968 (1937).

16. *Mayfair Bldg. Co. v. S & L Enter.,* 483 P.2d 1137 (Okl.1971).

17. Title 10 O.S.Supp.1990 § 1115.1(4).

The redispositional order is therefore vacated and the matter is remanded to the trial court for further proceedings consistent with the views expressed in this opinion.

Order vacated and cause remanded with instructions.

REIF, P.J., concurs.

MEANS, J., concurs in result.