In the Matter of G.C., B.C., J.C., H.C., and T.C., Alleged Deprived Children.

STATE of Oklahoma ex rel. DE-PARTMENT OF HUMAN SERVICES, Appellee,

v.

LeRoy COMBS and Diane Combs, Appellants.

No. 86,922.

Court of Appeals of Oklahoma, Division No. 4.

Oct. 29, 1996.

Carol Furr, Morgan, Morgan & Furr, Watonga, for Appellants.

George F. Burnett, Assistant District Attorney, Blaine County, Watonga, for Appellee State of Oklahoma.

Kyle E. Goerke, Kyle E. Goerke, P.C., Watonga, for Appellee Children G.C., H.C., and T.C.

Debra Annett, Benson and Annett, Watonga, for Appellee Children B.C. and J.C.

## MEMORANDUM OPINION

TAYLOR, Presiding Judge.

Appellants, LeRoy Combs (Father) and Diane Combs (Mother) (collectively, Parents), seek review of the trial court's order placing three of their children in long-term foster care after previously adjudicating the children as deprived. We affirm.

The record reflects Parents have five children. At the time this appeal was filed, G.C. was seventeen; B.C. was sixteen; J.C. was twelve; and twins T.C. and H.C. were three.[1] B.C. and J.C. each have been diagnosed with a learning disability. J.C. has attention deficit disorder; and B.C. is mildly mentally retarded, a condition shown to have resulted directly from neglect and malnutrition when the child was an infant.[2] The children were taken into protective custody by the Department of Human Services (DHS) on October 3, 1993, after they were found, alone and without supervision, in a dilapidated house in Blaine County.

The State of Oklahoma (State) thereafter filed a petition seeking an adjudication that the children were deprived, alleging they had been kicked out of their home by Father and abandoned by Mother. The petition also alleged Parents had been intoxicated for a large part of August and September 1993, and had left the children unattended and unsupervised. Though Parents later disputed these precise allegations, they do not appear to have contested them at the October 29, 1993, adjudicatory hearing, where Parents were present when the trial court found the material allegations of the petition were true.

At the October 29 hearing, the trial court adjudicated the children deprived, and placed custody in DHS. DHS placed the children in two foster homes, one in Kingfisher County and the other in Blaine County. Parents continue to live in Major County, and child welfare officials from all three counties have been involved in the case. A DHS case plan dated November 30, 1993, detailed a course of treatment and performance criteria to which Parents were expected to conform, including treatment for alcohol/substance abuse, and the following:

— That "[p]arents will demonstrate and maintain a stable environment among themselves";

— That "parents will participate in a minimum bi-monthly parent teacher contact"; and

---

1. According to the birth dates of the children appearing in the record, G.C. reached age eighteen while this appeal was pending. As a result, pursuant to 10 O.S.Supp.1995 § 7002–1.1.A.2, the district court's jurisdiction over G.C. has terminated, unless other factors not appearing of record have caused such jurisdiction to continue. To the extent the jurisdiction of the trial court over G.C. has ceased, then this appeal, and this opinion, are moot and of no effect. This determination as to G.C., however, does not alter the district court's jurisdiction, or the effectiveness of this opinion, as to B.C., J.C., T.C., and H.C.

2. This is the second time B.C. and G.C. have lived in foster homes. The first was when B.C. was an infant, when Mother and the two older children were living in another state prior to the time Mother and Father were married (according to the record, LeRoy is not the older children's biological father, but he has adopted them). The previous incident in which Mother lost custody occurred because of B.C.'s poor physical condition.

— That Parents will "[d]emonstrate the ability to deal appropriately with the children during visitation [and] to make safe decisions that involve the children."

The case plan also identified specifically that Parents "need to learn appropriate nurturing skills," and "will demonstrate the ability to provide a home where the children will receive regular healthy meals, clean living conditions, clean clothing and hygiene necessities." The trial court, at a disposition hearing on December 8, 1993, entered an order accepting and adopting the DHS case plan, and agreeing to placement as arranged by DHS.

Over the course of the next few months, in sessions with counselors and with a court-appointed special advocate, it became clear that the children had been subjected to abuse and neglect by Parents for most of their lives. As previously noted, B.C. and G.C. had been removed from Mother's custody when they were babies due to neglect and malnutrition. At the time the children were taken into protective custody in 1993, each of the children had scabies and were infested with lice. The twins suffered from a chronic diarrhea condition caused by an intestinal parasite due to unclean living conditions and poor diet. Parents are admitted alcoholics, and Father's work as an oilfield roustabout has been sporadic. When Father was employed, he was required to spend large amounts of time away from home. Mother would leave the children alone and unsupervised for various amounts of time and go drinking. Mother and Father frequently fought, including a number of fist fights. Though Father was primarily abusive with Mother, he also had resorted to physical violence with the children.[3] Though Father denied it, all other family members, including Mother, during counseling sessions accused him of sexually abusing H.C., and reported that they had seen blood in H.C.'s diaper at least once.

Regular review hearings were conducted by the trial court. In June 1994, the court ordered DHS to implement family counseling after receiving reports from the CASA worker and children's counselor describing the considerable progress made by the children since being removed from Parents' custody, and the older children's fear and anxiety of being returned to Parents' custody. In July 1994, the Major County DHS office filed a court report recognizing Parents were participating in the goals of the treatment plan and indicating Parents were cooperating in attempting to achieve those goals. However, the report also stated that "reunification can only be considered, if and when, the major issues surrounding the children's insecurities can be successfully dealt with, in the family sessions." This recommendation was repeated in other reports, as well.

Even so, the record contains numerous reports from counselors and caseworkers indicating the older children's overwhelming fear of being reunited with Parents, and their concern that they would not be safe if returned home. The reports also indicate Father's denial of children's fear, and his refusal to recognize their insecurity. At the same time, the children were reported to be doing very well in foster care. In April 1995, a custody evaluation performed by one family counselor warned that Parents' inability to understand and empathize with their children and their needs, coupled with Parents' own, individual personality disorders (as diagnosed by testing), made Parents a "present and future threat" to the health and welfare of the children.

A January 1996 DHS report, however, indicates that Parents have continued to work with DHS and appear to be making progress. The report states Parents "appear to have maintained sobriety and present themselves as getting along much better as a married unit"; that their home is clean; and that they have continued in marital and family counseling and continue to cooperate with DHS. Even so, the older children still resist seeing them, and refuse to attend unsupervised visits. The visits which do occur adversely affect all of the children, including the twins, evidenced by behavioral problems,

---

**3.** Father did, on one occasion, kick Mother and the children out of the home, and Father's brother, who lived nearby, refused to allow them to stay with him because he feared Father's temper. Mother and the children spent the night in a field.

sleeplessness, nightmares, and the like. The January 1996 report states that the twins were allowed to have one unsupervised visit with Parents in November 1995; and that T.C. returned with unexplained bruises on his arms. Parents have had other visits with the children since that time, but all have been supervised.

The January 1996 report also contains the recommendation of Blaine County child welfare workers that all of the children remain in DHS custody, in long-term foster care. The same report states that child welfare workers in Major and Kingfisher counties feel reunification of the entire family continues to be a realistic goal.

The trial court, following hearing on the matter in May 1995, entered its order in July 1995 requiring long-term foster care for G.C., B.C., and J.C. as a permanent plan due to "exceptional circumstances." For reasons not relevant here, that order was set aside and amended in January 1996, and an order containing substantially the same terms was entered.

Parents appeal, asserting four allegations of error. Eliminating repetition, those allegations raise three issues for our consideration: (1) whether placing the three older children in long-term foster care was an abuse of discretion and violation of Parents' constitutional right of due process; (2) whether the finding of long-term foster care was unsupported by "adequate, clear and convincing" evidence; and (3) whether the trial court abused its discretion because the evidence "indicated" Parents' failure to correct conditions was "contributed to" by the actions of DHS.

■ Parents assert their due process rights were violated because they allegedly performed all requirements of the DHS service plan, and the children were placed in long-term foster care "for reasons having no nexus to the conditions which led to the adjudication of the children as deprived." As such, Parents argue, they are unable to reasonably discern what requirements they must meet to be reunited with their children. Parents also argue that long-term foster care is a "de facto" termination of parental rights, and that appropriate procedures to terminate

were not followed. We reject both arguments.

■ Under 10 O.S.1991 § 1101(4) (renumbered as 10 O.S.Supp.1995 § 7001–1.3.9), a deprived child includes a child "who does not have the proper parental care ... or whose home is an unfit place for the child by reason of neglect ... on the part of his parents...." The fact that the parents believe their treatment of the children is not neglectful does not prevent the court from finding the children deprived. *Matter of S.T.G.,* 806 P.2d 636 (Okla.1991). However, "[a]ny parent whose child is adjudged to occupy a legal status termed 'deprived' must be judicially advised of those parental conduct norms which he is expected to follow or eschew to recapture a legally unencumbered standing as a parent." *Matter of C.G.,* 637 P.2d 66, 68 (Okla.1981).

Here, the DHS case plan adopted by the court set out specific and concrete goals which Parents were expected to achieve. The trial court has continued to monitor and be involved in the case, and, based on comments in the record and in the transcript, appears to be attuned to the needs of both Parents and the children. The trial court's requirement to attend family counseling carried with it, we believe, the implication that more than mere physical "attendance" at counseling sessions for an indefinite period of time would occur. Though counseling, when ordered, hopefully will result in reuniting a family, if the counselor(s) in question determine that certain of the parties refuse to participate or respond to treatment, then counseling may also result in a determination that reunification is not feasible. Otherwise, there would be no purpose for counseling to occur.

It may well be, as Parents' counsel aptly argues, that Parents do not *understand* what is required of them to be reunited with their children. However, Parents' *lack of understanding* seems to be the exact point of the family counselors' reports. Parents' inability to understand the basic requisites of parenting or nurturing recurs throughout the family history appearing in the record. Their neglect was the basis for the original decision

to remove the children from the home, and that same neglect, and the children's response to it, continues to form the basis for leaving them in foster care at the present time. The clear weight of the evidence supports the trial court's finding requiring long-term foster care on a permanent basis for the older children, just as it does its determination that continued efforts may prove beneficial to reuniting Parents with the twins.

We also reject Parents' argument that placement in long-term foster care is the equivalent of parental rights termination, and that the more stringent procedural safeguards associated with a termination proceeding should apply. In *Matter of Catlett*, 543 P.2d 552 (Okla.1975), the supreme court rejected a similar argument. There, the court found that because the trial court's order fixed custody only and did not vest authorization to place a child for adoption, the order was not equivalent to parental rights termination, and therefore the statutory notice provisions applicable to termination did not apply. Children have a right to expect permanence in the placement of their custody to the maximum extent possible. Each time the placement of their custody is changed, they are traumatized emotionally.

Although the statutory option of long-term foster care "as a permanent plan," now found at 10 O.S.Supp.1995 § 7003–5.6.A.2.d, was not available when *Catlett* was decided, the rationale used by the court applies here, as well. Under section 7003–6.1, "any decree or order made [in the course of a deprived child proceeding] may be modified by the court at any time," except that "an order terminating parental rights shall not be modified." This provision makes clear that the type of order entered by the trial court here remains open to later modification if conditions warrant. Parents' parental rights have not been terminated, and they have not been denied access to their older children. They may continue to try to mend the damage they have done to their relationship with the older children. In the meantime, however, given the age of the children affected by the order, the degree of

insecurity they continue to manifest, and their own expressed desire *not* to be reunited with Parents, the trial court's order was the correct one.

■ Parents next assert the State failed to prove by "clear and convincing evidence" that placement of the children in long-term foster care was warranted. A termination proceeding may well require proof by a "clear and convincing" standard. In *Matter of C.G.*, however, the supreme court recognized that in a deprived adjudication the state's burden is to demonstrate "by the clear weight of the evidence" that a deprived adjudication was warranted. 637 P.2d at 69 n. 8. It also held a parent bears the same burden in showing compliance with the court's orders concerning the children. *Id.* at 71. The trial court's role then becomes one of weighing "the potential of the parent to inflict harm upon the child ... against the other interests at stake—the parents' interest in freedom from familial disruption, the child's right to protection and the state's duty to provide it." *Id.* at 70 n. 8. As suggested by our discussion above, we find the state sustained its burden in this case, and the clear weight of the evidence favors the trial court's decision. We thus reject Parents' argument on this point, as well.

■ Finally, Parents contend the trial court abused its discretion because the evidence "indicated" Parents' failure to correct conditions was "contributed to" by the actions of DHS. Parents argue that they have been criticized for their failure and/or inability to nurture the children, and yet, because virtually all of their visits have been supervised, they "have not been given any opportunity to nurture or reestablish a bond" with the children. [Appellant's Brief, p. 17]. The only cases cited by Parents in support of this position are *Matter of J.M.*, 858 P.2d 118 (Okla.Ct.App.1993), and *Matter of A.S.*, 811 P.2d 910 (Okla.Ct.App.1991), both of which are factually distinguishable from the case at bar.[4]

---

4. *J.M.* was a parental rights termination case in which the court based termination on the father's failure to attend certain counseling sessions, when the counselor discontinued the relationship first. *A.S.*, though it involved an appeal from an adjudication of long-term foster care, presented a situation in which DHS filed no

As noted above, the older children refuse to attend unsupervised visits, stating they are afraid to do so, and one of the twins returned from the last unsupervised visit with unexplained bruises. We do not believe that DHS' reluctance to allow unsupervised visits under such circumstances constitutes a roadblock to Parents' achievement of the goals required by the court. We therefore reject Parents' argument on this point, as well.

The evidence in this case shows that Parents have not been able, at least to date, to correct the conditions that led to the trial court's finding that the children were deprived, although Parents have been given considerable time to correct the conditions.

service plan at all. None of these circumstances

The children continue to live in fear of unsupervised visits with Parents, and continue to exhibit adverse effects following even supervised visits.

Accordingly, finding no legal error, and finding the clear weight of the evidence supports the trial court's judgment, the judgment is AFFIRMED.

RAPP, C.J., and REIF, J., concur.