2008 OK 80

**In the Matter of BTW, Deprived child under the age of eighteen (18) years.**

**No. 105,671.**

Supreme Court of Oklahoma.

Sept. 16, 2008.

As Corrected Sept. 24, 2008.

Rehearing Denied Oct. 27, 2008.

Susan K. Meinders, Office of the District Attorney of Woodward County, Woodward, OK, for the State of Oklahoma.

Jean L. Foard, Carelyn Stuckey Talley, Foard, Talley & Stake, P.L.L.C., Woodward, OK, for the child.

D. Kent Meyers, Harvey D. Ellis, Jr., Mary H. Tolbert, Wade Gungoll, Crowe & Dunlevy, Oklahoma City, OK, for the foster parent.

Jami J. Fenner, Lester, Loving & Davies, P.C., Edmond, OK, for the mother.

WATT, J.

¶ 1 The appeal[1] of the district court orders of February 15[2] and 25,[3] 2008, respectively, involves visitation and placement matters relating to the child and will be resolved by a single opinion in the instant appeal,[4] retained by the Court *sua sponte.* We are asked to determine[5] whether the trial court abused

---

1. Title 10 O.S.2001 § 7003–6.4; 10 O.S. Supp. 2007 § 7003–6.2

2. The order of February 15, 2008 [the filing date of the order was the 15th while the review was actually conducted on February 11, 2008], provides that: 1) the continuation of the child in the home is contrary to the welfare of the child; 2) reasonable efforts have been made to finalize the permanency plan and to place the child accordingly; 3) active efforts have been made to return the child to the home; 4) the court approves the goal-plan of reunification with a parent, legal guardian or custodian; 5) reunification may occur when the mother successfully completes counseling, there have been successful and peaceful visitations, and upon court approval; 6) custody should remain with DHS; and 7) "[t]he Court further Orders that, at the convenience of DHS, the current foster home should be changed; that new foster parents are to be within the Woodward area so that there is no change in school or further inconvenience in visitation or counseling; that the Court prefers foster parents not associated with the Assembly of God Church in Woodward; and that the child is to remain in her current foster home until a new one is found and approved; that DHS is to keep the Court updated monthly into its search for a new foster home for [BTW]. The Court further Orders all parties cooperate in scheduling visitations, which are on Wednesday Afternoon and on every other weekend from after school on Friday to 8 P.M. on Sunday, with the first weekend visitation being on February 15–17, 2008."

3. The order of February 25, 2008 [the order was filed on the 25th but entered by the trial court on February 22, 2008] was issued without a hearing and denied: 1) the emergency motion for cessation of the mother's visitation rights; 2) a stay; and 3) directions to produce court-ordered psychological evaluation reports.

4. See, *Matter of Adoption of M.J.S.,* 2007 OK 43, ¶ 1, 162 P.3d 200; *Murg v. Barnsdall Nursing Home,* 2005 OK 73, ¶ 1, 123 P.3d 21; *Murg v. Barnsdall Nursing Home,* 2005 OK 74, ¶ 1, 123 P.3d 11; *City of Anadarko v. Fraternal Order of Police, Lodge* 118, 1997 OK 14, ¶ 1, 934 P.2d 328.

5. We do not find the appellee's assertion that the appeal should be dismissed as an untimely effort to appeal the jury verdict and "other orders" convincing. There has been no charge that the jury's verdict in the termination hearing in favor of maintaining the mother's parental rights should be set aside. Neither do we find the appellants' contention that the trial court "erred as a matter of law by the manner in which it proceeded in this case" persuasive. The first argument is that the trial court failed to make the findings necessary under 10 O.S. Supp.2007 § 7003–5.6(F)(1)(A) which directs the trial court to make certain findings once a decision has been made to place the child with the child's parent or kinship relations. The trial court did not make a determination that reunification with the mother was immediately appropriate and did not direct that placement be with a kinship relation. The second assertion is that the trial court did not consider the child's safety and potential for mental and emotional harm as required by subsections (F)(4) and (5) of the statute. The Permanency/Review Order filed on February 15, 2008, demonstrates that the trial court did consider such matters. The order provides in pertinent part at pp. 2–3:

"... III. Plan:
... Reunification may occur when the parents complete the following: *Successfully complete counseling; have successful and peaceful visitations; and upon approval of the Court.* ... The plan continues to be returning the child(ren) home if:
a. The parent(s) has/have made marked progress toward reunification;
b. The parent(s) has/have complied with the terms of the treatment plan, ___ and corrected the conditions which caused the child(ren) to be adjudicated deprived;
c. The parent(s) has/have maintained a close and positive relationship with the child(ren), and;
d. The child(ren) is/are likely to be returned home in the near future...."

Title 10 O.S. Supp.2007 § 7003–5.6(F) providing in pertinent part:
"At each review hearing the court shall:
1. Determine whether:
a. the child should be returned to the child's parent or placed with willing and suitable kinship relations....
4. Determine the safety of the child and consider fully all relevant prior and current infor-

its discretion in ordering visitation with the goal of reunification and in directing a change in placement.

¶ 2 The record contains facts in support of both sides of the controversy on the visitation and custody issues. Nevertheless, a review of the record and the transcripts reveal substantial evidence in support of the trial court's rulings. Because the trial court is better equipped to determine controversial evidence by its observation of the parties, the witnesses, and their demeanor [6] and because the judgment entered is not against the clear weight of the evidence,[7] we determine that the trial court did not abuse its discretion either by ordering continued visitation with the mother, the goal being reunification, or by directing a change of placement from the foster home whose environment does not promote reunification.

mation including, but not limited to, the report or reports submitted pursuant to Sections 7208 and 7003–5.6a of this title;
5. Inquire as to the nature and extent of services being provided the child and parent or parents of the child and shall direct that additional services be provided if necessary to ensure the safety of the child and to protect the child from further physical, mental, or emotional harm, or to correct the conditions that led to the adjudication of the child."

6. *Daniel v. Daniel*, see note 49, infra; *Manhart v. Manhart*, see note 48, infra; *Perry v. Perry*, 1965 OK 160, ¶ 5, 408 P.2d 285.

7. *Duncan v. Duncan*, see note 50, infra; *Waller v. Waller*, see note 50, infra. See also, *Williamson v. Williamson*, note 50, infra; *Casey v. Casey*, note 50, infra.

8. Generic references to parties are utilized in the same spirit of protecting the privacy of the child as that expressed in Rule 1.25, Oklahoma Supreme Court Rules, 12 O.S.2001, Ch. 15, App. 1 providing in pertinent part:
"... (b) ... In appeals from juvenile proceedings including, but not limited to, adoption and paternity proceedings and proceedings under the juvenile code, the initial of the child's name shall be used rather than the child's name...."
*Matter of Adoption of M.J.S.*, see note 4, supra.

9. The mother's formal diagnoses have included depression and borderline personality disorder. Throughout her psychological treatment, the mother has exhibited confusion, depression, mood swings, insomnia, agitation, blackouts,

## CONTROVERTED FACTS AND PROCEDURAL HISTORY

¶ 3 The facts of the cause are highly disputed. Additionally, the record contains at least some evidence to support all arguments made by each of the parties. Finally, the litigation has been long and complex.

¶ 4 After the child was placed in the mother's [8] home in a fostering situation, DHS supported the mother's adoption of the child in August of 1999. At that time, DHS had knowledge of the mother's background and medical conditions, including a history of mental illness.[9] No problems were reported in the home until 2005. At that time, the mother's condition deteriorated, apparently due to a misdiagnosis and the prescribing of medications which were detrimental to the mother's physical and psychological health.[10] At the same time, the child began to experience difficulties. School officials reported a

flashbacks, panic attacks, and periods of memory loss. The mother has had recurring periods when she was non-compliant in taking her medications as prescribed while at other times would work with professionals who closely monitored her medication intake. See, Transcript of jury trial, William Allen Mitchell, M.D., a physician of psychiatry, testifying, at pp. 386–401.

10. The testimony in the jury trial transcript is contradictory as to whether the mother actually had a seizure disorder or whether the drugs, normally prescribed for seizures, were given in an attempt to treat her mental illness. Nevertheless, there is evidence that the medications prescribed were detrimental to the mother's ability to function. Transcript of jury trial, August 13–16, 2007, William Joseph Westerheide, Doctor of Applied Psychology, Licensed Professional Counselor and Licensed Drug and Alcohol Counselor, testifying in pertinent part at pp. 782–83 (as read into the record):
"... Q. What medication changes were you aware of?
... A. The major change is—that sticks out the most was when she was given the anti seizure drugs and that went very poorly. The e-mails that I-that she would write me an e-mail and she would talk about the physical problems of just getting around, walking, being groggy, not being able to connect things that had never been part of her past. And the e-mails themselves itself you could see that there was cognitive function problems because she had misspellings that weren't there before, gaps in logic and thinking that just wasn't there, you know, in her previous e-mails...."

change in the child's demeanor. BTW exhibited signs of stress, suffered hair loss,[11] and expressed fear of the mother.[12]

¶5 On April 25, 2005, DHS received information alleging that the child was being neglected.[13] The allegations of abuse arose from observations of the child's school counselor.[14] DHS did not find evidence of neglect nor did it recommend legal action to the district attorney. Instead, a "services recommended" finding was entered indicating the need for the mother to place the child in counseling on a regular basis.[15] The investigation was closed by June 20, 2005.

11. The mother asserts that the child was pulling out her own hair while the foster parent alleges that the mother was tweezing the child's hair. See, Transcript of jury trial, August 13–16, 2007, Tom Marcum, DHS Child Welfare and Foster Care Specialist, testifying in pertinent part at p. 56:

"... Q. Were there any unresolved red flags in this one that you can remember?

A.... In this case it was a question from day one when we received the referral whether [the child] was pulling her own hair or if it was something that we [sic] being done to her...."

12. Transcript of jury trial, August 13–16, 2007, Donna Nelson, School Counselor, testifying in pertinent part at p. 25:

"... Q. How did [the child] let you know that she was afraid?

A. She told me that she was afraid and that she didn't like it when her mother yelled at her. And that her mother told her that she had the infected hair follicles that's why—and [the child] indicated that she and her mother both were pulling her hair to get rid of the infected hair follicles...."

13. The record indicates that DHS was advised on multiple occasions of difficulties in the mother's and the child's home. Transcript of jury trial, August 13–16, 2007, Leona Livshee, Head Start employee, testifying in pertinent part:

at pp. 218–30 "... Q. Okay. Did you—or did you, yourself, or did you encourage someone else to make any kind of referrals to D.H.S. regarding [the child's] welfare?

A. I made as far—I don't remember when I made them, but I know I made one or two referrals, but it's been over the years I made the referrals.

Q. Why did you make those referrals?

A. One time was because I went to visit [the mother] in the evening. She was not feeling good. I asked her why she wasn't sleeping and she said, I haven't slept in three days because of the voices. Why do—I said, why don't you go to the doctor to get something to help you sleep so you can relax. She said, I can't because the voices may make me harm myself or my child. So she wouldn't sleep while she was on these meds—the meds she was on, because she always heard voices....

Q. And what was the other time?

A. The other time would have been after Dallas, I think—see, I'm not sure of dates, or anything. But I know I called a second time because I was really worried about [the child] at that point.

Q. Why were you worried?

A. Because while [the mother] was in Dallas and had—that had to be the second time, because [the mother] was in Dallas, she called me every night, we spoke. And in the beginning she said she was really afraid—after about a week of being there she was really afraid because she was afraid that—there was a cemetery, either, across the interstate or the street from her room. When she'd open up her blinds and—she said she really thought the reason she was there, that everybody sent her there, was because they wanted her to commit suicide or they would—something would happen to her there and none of us would ever see her again...."

14. Transcript of jury trial, August 13–16, 2007, Donna Nelson, School Counselor, testifying in pertinent part at pp. 9–10:

"... Q. And do you remember at what time you made that—the very first referral, if you've made several?

... A. I'm sorry. I had—in April of her 2nd Grade school year I had some concerns and I made a referral to the school nurse and, as well as, to child welfare about my concerns.

Q. What specifically were your concerns?

A. [The child] had—through the school year had had a personality change and she had become withdrawn, not quite as outgoing and social as she had been in her 1st Grade year. She began showing signs of hair pulling. She had places in her hair where she pulled out the hair and bald spots in her head. And I had visited with [the child] and she shared some information with me about what was going on and the things that she was worried about at home that were causing some of these behavior changes...."

15. Tom Marcum, DHS Child Welfare and Foster Care Specialist, explained the meaning of a "services recommended" finding. Transcript of jury trial, August 13–16, 2007, Tom Marcum testifying in pertinent part:

at p. 46 "... Q. Can you explain to me and, also, to the jury what that really means?

A. It's really—services recommended is not really a finding of confirmation of abuse or neglect and it's not a finding of there's nothing there it is just a recommendation by the Department that there needs to be some followup completed by the family in regards to the allegations that are contained...."

at pp. 109–10 "... Q. And is services recommended mean a finding—a finding of services recommended is made when the report is determined to be unfounded or there's insufficient

¶ 6 Also during June, the circumstances leading up to the instant controversy were set in motion. Realizing that she was having difficulties both mentally and physically after beginning on the seizure medications, the mother sought additional treatment at a facility in Texas. Knowing she would be hospitalized for a period of time, the mother contacted the foster parent whom she met through her attendance at the Assembly of God Church. She informed the foster parent that she was facing an extended hospitalization and that the child's grandmother was unavailable to care for the child due to her husband's illness. Before agreeing to take the child into her home, the foster parent allegedly requested to be appointed as guardian. DHS was notified that the guardianship had been granted as of June 23, 2005.

¶ 7 Although the mother acknowledges that her illness might frighten her daughter,[16] she alleges that when her child first went to stay with the foster parent BTW missed her and looked forward to their visitations. The mother also asserts that after she left the hospital, the foster parent would not permit her to see the child in private, allowing only short, supervised visits, separated by long intervals between contacts. The mother contends that, only after having lived in the foster parent's home, did the child become frightened in her presence and begin resisting reunification. **The mother's arguments are supported by testimony in the record from the guardian *ad litem*[17] and by BTW's school counselor[18] indicat-**

information to fully determine whether child abuse or neglect has occurred and the child and family may benefit from prevention and intervention related services?
A. Yes...."
One DHS employee testified that had the child not already been placed with the foster parent when the earlier deprived report was made, DHS would have pursued a finding of deprived status after receiving the complaint in April resulting in the removal of the child from the home. Nevertheless, the DHS employee who actually investigated the cause indicated he did not learn of the placement of the child with the foster parent until after the cause was closed. See, Transcript of Review Hearing, February 21, 2007, Tom Marcum, DHS Child Welfare and Foster Care Specialist, testifying in pertinent part at pp. 49–52 and 117.

16. Transcript of jury trial, August 13–16, 2007, the mother testifying at p. 987:

"... Q. Do you believe it's possible that that part of your illness scares [the child]; is that possible?
... A. Certainly, I guess so. It's possible. Just as not...."

17. Transcript of jury trial, August 13–16, 2007, Robyn Price, Guardian *Ad Litem*, testifying in pertinent part at pp. 1007–08:

"... Q. Did you make any recommendations to the Court in the Guardianship regarding frequency of visitation?
A. I did. Whenever I got involved [the foster parent]—she had been involved—she had the authority to set the number of visits. And at that time whenever I got involved they were very, very minimal. I believe it was once every two weeks. I absolutely disagreed with that and recommended more visitation to try to get on some kind of visitation schedule...."

Q. Did you make the recommendation for the Judge to place [the child] in D.H.S. custody eventually?
A. I think the Judge ultimately made that recommendation.
Q. Did you think it was a good thing?
A. I thought it was. I thought for two reasons. I thought [the mother] would get more visitation with [the child] and I was hopeful that that relationship would be reunified. I had always sensed a desire on [the child's] part to get back together with her mother. I felt that the current arrangement with [the foster parent] was not a positive relationship in reuniting this family...."
When the guardianship was terminated, the guardian *ad litem* did not recommend that the child either remain in the foster home or be returned to the mother. The guardian *ad litem* did recognize that the child trusted the foster parent and that she was safe and happy in the foster parents' home. Finally, the same witness indicated in the termination proceedings that the child did not want to be unified with her mother and that she continues to fear her mother. The guardian *ad litem* went so far as to recommend termination of parental rights as being in the child's best interests. See, transcript of jury trial, August 13–16, 2007, Robyn Price, Guardian *Ad Litem*, testifying in pertinent part at pp. 19–20 and 1007–1029.

18. Transcript of jury trial, August 13–16, 2007, Donna Nelson, Elementary School Counselor, testifying in pertinent part:
at pp. 11–12 "... Q. How long did you observe these—this personality change in—was that in the 2nd Grade year?
... A. .... Then the 3rd Grade school year when she came and would begin to see me that's when she was still having some visitation with her mother and she shared some of the problems and the fact that she was afraid of her mom and afraid of being yelled at, even

ing that they believed the child wanted to be with her mother early on during the guardianship and that the foster parent interfered in that relationship. In April, 2006, during the hearing on the termination of the guardianship, the trial court observed that "there has become such a personal and separate conflict between the guardian and the mother of the child that one could not reasonably expect them to rebuild the relationship with the child." [19]

¶8 In May of 2006, DHS again became involved with the child when reports of the mother's volatile behavior towards the child, the foster parent and a DHS supervisor were made.[20] The child was: adjudicated de-

prived on July 31, 2006; made a ward of the court; and placed in DHS custody. DHS allowed the child to continue to live with the foster parent. The mother asserts that DHS ignored the fact that the child's grandmother was willing and eligible to take the child into her home when the child was placed in foster care.[21] DHS officials contend that because of the volatile nature of the relationship between the mother and the grandmother, the mother had indicated she did not trust BTW to be in the grandmother's home.[22]

¶9 On August 31, 2006, the district court entered a disposition order adopting an individual treatment and service plan.[23] In De-

when she wasn't in trouble. So during that 3rd grade year she was still looking forward to those visits and then that began to change and she didn't want to go. And she was anxious about those things...."
at p. 27 "... Q. Do you think that [the child] is being truthful to you about her feelings?
A. Yes, I do. Yes, I do. Because when [the child] first began to see me she wanted to go to her mother's and visit her mother and then that began to change...."

19. Record, p. 142, Exhibit A to Brief Addressing Issues to be Determined at Review Hearing, filed February 21, 2007.

20. Transcript of jury trial, August 13–16, 2007, Linda Semmel, County Director for the Department of Human Services, testifying in pertinent part at pp. 243–44:
"Q. (By MS. MEINDERS:) Ms. Semmel, I asked you about the nature of the referral that you were working....
A. [The mother] was having volatile behavior that required supervised visits with [the child.] When I became involved my interview with [the mother] and my interview with [the child] and my interview with [the foster parent] all indicated that [the child] was very afraid of her mother. [The mother], herself, admitted to throwing the last Supervisor Maria Perez and [the child] out of her home because she was unhappy with the limited access that she was getting to [the child]. [The child] was verbalizing her distress, her fear and her anxiety about being with her mother and was verbalizing that she was very fearful of her mother and her erratic behavior...."

21. Like the majority of the facts presented in the cause, it is contested as to whether the grandmother was interested in acting as placement for the child when the mother voluntarily placed her with the foster parent. In *Matter of Adoption of M.J.S.*, see note 4, supra, we did not address the issue of whether the preferential order for custody determinations established by 10 O.S. Supp.

2007 21.1 was mandatory or merely served as a guide in custody matters subject to a determination of the child's best interests. Nevertheless, we did note the existence of *In re Baby Girl L*, 2002 OK 9, ¶21, 51 P.3d 544, *as clarified on rehearing* (2002), addressing the impact of the "best interests" language contained in § 21. In so doing, we acknowledged that the statute contained the best interests standard and that a trial court's failure to consider the standard would result in rendering the language of the statute superfluous or useless rather than recognizing all portions of the statute as operative. Title 10 O.S. Supp.2007 21.1(A) providing in pertinent part:
"Except as otherwise provided by this section, custody should be awarded or guardian appointed in the following order of preference according to the best interests of the child to:
1. A parent or to both parents jointly;
2. A grandparent ...."

22. Transcript of jury trial, August 13–16, 2007, Linda Semmel, County Director for the Department of Human Services, testifying in pertinent part at pp. 262–63:
"... Q. And did you discuss the possibility of [the child] going to live with [the grandmother]?
A. Yes, we did.
Q. And what did she tell you about that?
A. She attempted to put [the child] with her mother on more than one occasion. And the last time that she approached her she couldn't. There were health issues that were going on and various other things. At that time [the mother] indicated that she didn't really trust anyone within her family to be involved. They have a very strange relationship, at best. It's a very volatile situation. I have had conversations with [the mother], with her mother [the grandmother] and with her sister ... all of which indicate that the relationships are very bad...."

23. Title 10 O.S. Supp.2006 § 7003–5.3 providing in pertinent part:

cember of the same year, DHS sought termination based on allegations that the mother failed to comply with the treatment plan. The mother contends that no evidence existed to support noncompliance. Neither party's position is entirely persuasive.[24]

¶ 10 On June 18, 2007, DHS filed an amended motion to terminate parental rights, alleging that the mother's mental condition would not respond to treatment.[25] The following month, the mother filed a motion for summary judgment asking that the cause be dismissed on grounds that the child was not deprived. The trial court overruled the motion. At the end of a four-day trial, the jury returned a verdict on August 16, 2007 refusing to terminate the mother's parental rights.

¶ 11 Following the trial, DHS allowed weekly, one-hour, supervised visits between the mother and the child in its offices. On September 17, 2007, the mother filed a motion to assume full custody of the child or, in the alternative, to have the child's placement moved from the foster parent. The trial court held two permanency/review hearings, one on October 26, 2007 and a second on February 11, 2008.

¶ 12 At the first hearing, the guardian *ad litem* again recommended that the child be removed from the foster parent's home because of the interference in the relationship between BTW and her mother.[26] Contra to this opinion, the DHS caseworker believed the child should stay in placement with the

"A. An individual treatment and service plan shall be filed with the court within thirty (30) days after a child has been adjudicated to be deprived...."

24. Testimony in the termination proceeding indicates that the mother had not succeeded in eliminating the risk factors identified in the plan of reunification. See, transcript of jury trial, August 13–16, 2007, Linda Semmel, County Director for the Department of Human Services, testifying in pertinent part at pp. 253–55. The child's social worker expressed fear for the child should she be moved back to the mother's home. See, transcript of jury trial, August 13–16, 2007, Audry E. Haldaman, Licensed Clinical Social Worker, testifying in pertinent part at p. 333. The mother's counselor indicated she believed the mother was emotionally abusive to the child. See, transcript of jury trial, August 13–16, 2007, Zelma L. Clark, licensed counselor testifying in pertinent part at p. 767. However, there is also support for the fact that the mother completed parent education plans required in the plan [see, transcript of jury trial, August 13–16, 2007, Linda Semmel, County Director for the Department of Human Services, testifying in pertinent part at p. 300] and made attempts to get the child into counseling. See, transcript of jury trial, August 13–16, 2007, Zelma L. Clark, licensed counselor testifying in pertinent part at p. 735.

25. Title 10 O.S.2001 § 7006–1.1 providing in pertinent part:

"A. Pursuant to the provisions of the Oklahoma Children's Code, the finding that a child is delinquent, in need of supervision or deprived shall not deprive the parents of the child of their parental rights, but a court may terminate the rights of a parent to a child in the following situations; provided, however, the paramount consideration in proceedings concerning termination of parental rights shall be the health, safety or welfare and best interests of the child:
... 13. A finding that all of the following exist:
a. the child has been adjudicated deprived, and
b. custody of the child has been placed outside the home of a natural or adoptive parent, guardian or extended family member, and
c. The parent whose rights are sought to be terminated has a mental illness or mental deficiency, as defined by Section 6–201 of Title 43A of the Oklahoma Statutes, which renders the parent incapable of adequately and appropriately exercising parental rights, duties and responsibilities, and
d. the continuation of parental rights would result in harm or threatened harm to the child, and
e. the mental illness or mental deficiency of the parent is such that it will not respond to treatment, therapy or medication and, based upon competent medical opinion, the condition will not substantially improve, and
f. termination of parental rights is in the best interests of the child...."

26. Transcript of review hearing, October 26, 2007, Robyn Price, Guardian *Ad Litem*, testifying in pertinent part at p. 7:

"... Q. And was it your testimony also that [the foster parent] had interfered with the relationship between [the mother] and her daughter ...
A. I believe so, yes.
Q. And did you have any information that that interference continued during her placement—her being placed by D.H.S. for [the child] during this proceeding?
A. Well, the child's relationship with the mother had significantly declined, decreased, they separated even further and the constant

foster parent and that a change in custody would be traumatic to the child.[27] Although the caseworker characterized the mother-child relationship as "fragile," she indicated the relationship should be fostered.[28] Nevertheless, she believed that visitation should continue to be supervised because of heated exchanges among BTW, the mother, and the grandmother.[29] At the time of the hearing, the mother was regularly attending her appointments with doctors and therapists and had become employed.[30] Nevertheless, DHS progress reports indicate the mother was without counseling from June 15, 2006 until January 5, 2007.[31]

¶ 13 At the close of the review hearing, the trial court ordered that a different placement be found for the child and that all parties continue to work towards reunification with the mother. The trial court also ordered that: 1) visitation be increased with a view to allowing weekend visitations in the mother's home within thirty days; 2) DHS expand its search for an appropriate temporary placement to the three county area with individuals of a different faith than that of the foster parent; 3) as well as continuing current counseling sessions, the mother and child would participate in family counseling; and 4) the mother execute a release of her medical records so that they could be reviewed and monitored.

¶ 14 During the interim between the first and second review hearings, increased visitation did occur but DHS did not find alternative placement for the child. For the first time, at the second review hearing, the foster parent intervened. DHS requested that the child remain in out-of-home placement and that reunification efforts be terminated. The request was based on testimony that the child's grades were dropping and that she was emotionally distraught and exhibited high levels of stress and anxiety along with physical complaints ranging from the inabili-

had been that she remained in [the foster parent's] home...."

27. Transcript of review hearing, October 26, 2007, Jimmie Rae Fraley, Caseworker II, testifying in pertinent part at:
p. 23 "... Q. Ms. Fraley, what was your recommendation in the report that you prepared and filed on September 17th?
A. Um, it would have been for [the child] to continue in D.H.S. custody and in her current placement...."
at p. 32 "... Q. As far as [the child's] placement, changing from [the foster parent], as the worker in this case up until a week ago what's your recommendation?
A. My recommendation is not to change that at this time. I think that that would be extremely traumatic for [the child.] She feels very safe there. She feels love there. And she has stated that she wants to stay there forever...."

28. Transcript of review hearing, October 26, 2007, Jimmie Rae Fraley, Caseworker II, testifying in pertinent part at pp. 27–28:
"... Q. What's your opinion being the worker on this case for the last year of the status of [the mother's] and [the child's] relationship?
... A. I think their relationship is still pretty fragile. I am seeing some good things happen between them, but it's—it's still very fragile.
Q. (BY MS. MEINDERS) Do you believe that, even though it's fragile that you still need—that the department should still foster a relationship between the two?
A. Yes, I do...."

29. Transcript of review hearing, October 26, 2007, Jimmie Rae Fraley, Caseworker II, testifying in pertinent part at pp. 36–37:
"... Q. Why do you believe that the visitations should be supervised at this time?
A. Because we have had two incidence [sic] where [the mother] became upset over the discussion of scheduling of the visits. That was in the very first visitation. And it was quite an anger outburst. [The child] became very upset during that and said, if we're going to become angry let's just stop the visit right now. She—you could see [the child] was very upset over that. [The mother] left and we did go ahead and schedule the next week's visitation, but it was quite loud...."

30. Transcript of review hearing, October 26, 2007, the mother testifying in pertinent part at pp. 146–47:
"... Q. Have you been regularly attending your appointments with your doctors and therapists?
A. Yes. The only visit I missed was yesterday. I had worked for the first time. I started a new job....
Q. What is that?
A. I work at the Walmart Photo–Portrait Photo Center and I'm training right now...."

31. Individualized Service Plan Progress Report, filed February 16, 2007, providing in pertinent part on p. 9:
"... [T]he mother was without a counselor from June 15, 2006, until January 5, 2007...."

ty to sleep to headaches and stomachaches.[32] One counselor did not believe reunification efforts should continue[33] and BTW's teachers felt that there had been definitive negative changes in the child since the reintroduction of the mother into her life.[34] The child's individual counselor testified that the child was doing well in the foster environment and that BTW had deep-seated fears of returning to the mother's home. It was his opinion that the child's best interests would be served by staying in the foster home.[35] However, the child's grandmother stated that the extended visitation periods were going well and the child was enjoying herself.[36] The grandmother had also visited with the child's teachers who gave her the impression that, with the exception of some difficulties with math, the child was doing well.[37] **One**

32. Transcript of review hearing, February 11, 2008, Sue Lougee, DHS Child Welfare Specialist, testifying in pertinent part at p. 11:
"... Q. And what are your recommendations as to [the child] at this time?
A. At this time I believe that [the child] needs to continue in out-of-home placement. Continue her counseling. And I am concerned about the reunification efforts and the impact it's having on [the child].. Her grades have dropped and she's emotionally distraught and has a high level of stress and anxiety....
Q. Has she exhibited, to your knowledge, any other detrimental—
A. Well, I know she reports having trouble sleeping. She reports having physical symptoms of headaches, stomachaches and gets real anxious right before visits...."

33. Transcript of review hearing, February 11, 2008, Dr. John Benton Stewart, II, Clinical Psychologist, testifying in pertinent part at p. 69:
"... Q. Okay. Have you come to a conclusion as to whether or not reintegration with her mother is really practical or in the child's best interest?
A. I'm not sure that it is in her best interest. My concern is that [the child] was very well adjusted, happy girl and she's—my concern is that she's becoming a lot more emotionally disturbed or having a lot more emotional difficulties the further this reintegration proceeds. I'm seeing a lot more difficulties.
Q. What kind of difficulties are you seeing?
A. Increased anger, some increased depression...."

34. Record p. 667, Letter dated February 7, 2008, signed by 5th grade teachers Diana Irving and Anna Hauge providing in pertinent part:
"... I have noticed that [the child] is not as happy as she used to be in my class. She used to joke and tease me before she had to visit [the mother], and she no longer does this. In the past, [the child] found it easy to focus and do her work, now it is hard for her to concentrate. She has also started to whine about little things, which she never did before. Mrs. Irving has noticed that she has reverted to using baby talk.
I personally witnessed her choosing not to speak to [the mother]. My teaching partner and I were having conference with [the mother] when [the child] returned to the classroom. Most kids, when they see a parent, will excitedly say, "HI!" and even hug their parents. [The child] did not even acknowledge her presence. She entered the classroom and then left without saying a word to [the mother], even though [the mother] said, "Hi, sweetie!" [The child] later came up to Mrs. Irving and said very hatefully, "Is she gone?"
A definite negative change has taken place with [the child] since [the mother] reentered her life...."

35. Transcript of review hearing, February 11, 2008, Dr. John Benton Stewart, II, Clinical Psychologist, testifying in pertinent part:
at p. 84 "... Do you believe that [the child] is truly fearful of staying with her mother? Do you believe that that's a true fear in her?
A. I think she's truly fearful of going back to live with her mother, yes.
Q. Does she express that to you?
A. Yes. Every time I see her.
Q. Do you believe it's in [the child's]—what do you believe is in [the child's] best interest? What is—what do you believe is the best recommendation at this time?
A. I believe that for [the child's] best interest it would be for her to continue to live in the [foster home]...."
at p. 89 "... Q. It is your recommendation to the Court that it's not in [the child's] best interest to continue reunification; isn't that correct?
A. Yes...."

36. Transcript of review hearing, February 11, 2008, the grandmother testifying in pertinent part at pp. 96–97:
"... Q. Overall how would you say the visits have gone between [the child] and [the mother]?
A. Any time I was present, I thought they went very well....
Q. Have you observed [the child] exhibiting behavior consistent with fear?
A. No. I have called [the mother's] house and talked to her and I could hear [the child] in the background laughing and playing and she didn't sound to me like a child that was scared...."

37. Transcript of review hearing, February 11, 2008, the grandmother testifying in pertinent part at pp. 103–04:

of the grandmother's friends testified that when BTW attended church with the mother that the child seemed pleasant and was affectionate with her mother, especially during the period while the foster parent was out of the country and the child was staying temporarily with another individual.[38] A friend visiting in the mother's home while the child was present also indicated that the mother was doing all she could to make the child comfortable and that the child seemed to enjoy the visits.[39] These observations are in tune with a statement made by a DHS employee who supervised a visitation session between BTW and her mother.[40] They also comport with the testimony from the termination hearing by two of the mother's therapists[41] indicating that the mother is a good parent duly concerned with her

"... Q. Now, you've also went with your daughter to [the child's] school to visit with her teachers, correct?
A. Yes, I did.... I thought it went really well. We went to her first teacher, Mr. Burnett and he said [the child] wasn't behind in anything. She was a good student in Reading and English and she got a long [sic] well in the classroom....
Q. And what other teachers did you—
A. We went to her Math teacher and the teacher that did her Spelling and Science, I believe it was. And the only thing that she was having trouble with was Math. She was struggling a little in it...."

38. Transcript of review hearing, February 11, 2008, Colleen Brown testifying in pertinent part at pp. 116–17:
"... Q. And how are things going at church?
A. Well, I think they have gone well. I noticed a difference in [the child] in December. She seemed to be more pleasant and more easier to talk to there for a period of about three weeks, but I didn't know then that she was not in the home of the [foster parent]....
Q. Did you see another change after—in [the child] after the [foster parent] returned?
... A. She was a little more distant, and even to myself she was...."

39. Transcript of review hearing, February 11, 2008, Becky Everson, teacher's aide, testifying in pertinent part at p. 152:
"... Q. Have you had an opportunity to be around [the mother] and [the child] together during these last three months when they have had unsupervised visitations?
A. Yes.
Q. And how would you describe how they have interacted?
A. They have gotten a long [sic] pretty good. A little strained at times. But they have gotten a long [sic] pretty good when they've been together...."

40. Transcript of review hearing, February 11, 2008, Linda Semmel, County Director, DHS, testifying in pertinent part at pp. 39–40:
"... During the visitation, [the mother] did very well. She tried to interact very positively with [the child]. She had activities. They went through some of her stuff in her room. I mean, just tried to be familiar in the house. They dressed their dog. They did things that were appropriate...."

41. Transcript of jury trial, August 13–16, 2007, Zelma L. Clark, licensed counselor testifying in pertinent part:
at p. 731 "... Q. And did you also inform Mr. Marcum that [the mother] is a good parent who is appropriately concerned for [the child's] welfare and is doing all that she knows to do to assist her [daughter]?
A. Yes...."
at p. 736 "... A. It is my opinion that [the mother] may have some problems, but one [sic] is not being a loving mother. She's very much concerned about her daughter's problems and does her upmost to see that [the child] gets the best possible care....'
Transcript of jury trial, August 13–16, 2007, William Joseph Westerheide, Doctor of Applied Psychology, Licensed Professional Counselor and Licensed Drug and Alcohol Counselor, testifying in pertinent part (as read into the record) at pp. 797–98:
"... Q. Do you have an opinion whether Ms. Webster is able to care for [the child] on a daily basis?
A. Are you talking about physically, physiological—
Q. Let's talk about physically first?
A. Yea, certainly. I don't think there's a problem now that she's on the right medication.
Q. What about morally and intellectually?
A. Morally, certainly. [The mother] has always had very high moral standards. And intellectually, I think, there's going—she's going to need some support if [the child] comes back because of all that's happened in between....
Q. Does [the mother's] character—how—does it inhibit her from providing for [the child's] ordinary comforts?
A. No.
Q. Can [the mother] care for and feed herself and [the child]?
A. Yes.
Q. Okay. Is [the mother] able to make decisions about her daily living?
A. Yes.
Q. Can she see that [the child] gets to school and—
A. Yes...."

child's welfare and is capable of providing for the child's physical, mental, and moral needs.

¶ 15 By the time of the second review hearing, the mother's medication had been reduced to a single prescription for depression. She was no longer working, but she was attending regular counseling sessions. Nevertheless, she admitted that the strain of continuing with DHS supervision and court involvement contributed to an increase in anxiety, sleeplessness, head and stomach aches along with nausea.[42] When the child was called to testify, she reiterated that she did not want visitations to continue because she was fearful when staying with her mother and she felt that her mother treated her poorly. BTW gave examples of her mother having yelled and cussed at her and having patted her on the bottom. She was also upset about changing church congregations.[43] Nevertheless, when questioned by the trial judge, the child admitted there were times she enjoyed with her mother.[44]

¶ 16 Following the second hearing, the trial court issued an order directing a change of placement from the foster home, requiring a

plan of reunification with the mother, and denying the appellants' emergency motion to discontinue visitation with the mother. The appellants sought an emergency motion for a stay and to halt visitations pending their filing of an original action with this Court. The trial court overruled the motion. The appellants filed an application to assume original jurisdiction and a petition for writ of prohibition[45] along with an application for an emergency stay on February 25, 2008. Two days later, we granted the stay in part.

¶ 17 On April 18, 2008, the Court assumed original jurisdiction and issued a writ prohibiting the respondent judge and any other judicial officer in Woodward County from proceeding further in the cause. We also retained the cause on our own motion and ordered the stay to remain in place pending resolution on appeal. In response to the request for clarification, we issued a subsequent order on May 12, 2008, which allowed the motion to discontinue visitation to be considered in the district court and leaving all other aspects of the April 18th order unaltered.[46] On June 19, 2008, after a hearing

42. Transcript of review hearing, February 11, 2008, the mother testifying in pertinent part at p. 170:

"... Q. How would you describe the status of your mental health currently?
A. I'm more depressed here this last bit. I've been anxious, much like [the child], because our lives resolve [sic]—get handled in a Courtroom by lots of attorneys and a Judge, ultimately, and we have no real say. I agree with [the child]. We may have a say to contribute a word to say, but—and we may be heard, but ultimately we have no control. And that's where my anxiety, extra depression, trouble sleeping, headaches and even stomach and nausea problems myself...."

43. Transcript of review hearing, February 11, 2008, the child testifying in pertinent part at pp. 222–24:

"... Q. Okay. Well, tell us what those other things are?
A. Like just yelling at me and cussing around me, taking me out of the church she established me in, that I've been going to for almost the past five years of my life....
Q. So you're upset with your mom for taking you out of your activities at the Assembly of God; is that right?
A. Very, very upset, because she's just ripping me and my best friends apart.

Q. And you've been going with her to the Christian Church, correct?
A. Yes.
Q. But you don't like it there?
A. There's not even—you have to sit there while the preacher preaches the whole time. And at my home church, the First Assembly of God, they actually have a children's church prepared for you...."

44. Transcript of review hearing, February 11, 2008, the child testifying in pertinent part at p. 225:

"... THE COURT: On your visitations with your mom has there been good times, too?
A. A few, but not many...."

45. o. 105,595, Matter of BTW.

46. he district court issued an order on June 19, 2008 ordering supervised visitation between the mother and the child to occur not more than one time per week. On May 5, 2008, the guardian ad litem filed a report with this Court to address assertions of "additional evidence" of "mounting distress" on the child. Witness interviews by the guardian ad litem indicate the following: 1) the child's counselor indicated that he was unaware of any additional concerns relating to visitation and would recommend increasing such through the summer months and that the child's attitude

encompassing nineteen hours over a two-day period, the trial court ordered supervised visitation between the mother and the child to take place not more than once per week. The briefing cycle was completed on June 18, 2008 with the filing of the reply brief. However, the record was not filed in this Court until July 11, 2008.

¶18 **No abuse of discretion occurred either in the ordering of continued visitation with a goal of reunification or in the direction to change placement.**

¶19 The appellants argue that the trial court abused its discretion both by ordering continued visitation with a plan towards reunification and by requiring a change of placement from the foster home. The mother asserts that there is sufficient evidence in the record to support the trial court's findings. Although we recognize that the facts have been hotly contested and that a wide range of evidence has been presented, we agree with the mother's contentions. **The only basis upon which we could hold that the trial court erred in ordering continued visitation with a goal of reunification or in the direction to change placement would be to determine that the trial court was not entitled to reject conclusions of some witnesses and accept those of others. This we may not do.**[47]

 ¶20 The instant cause concerns the trial court's findings regarding a change in placement and visitation. In making such decisions, the paramount consideration remains the best interests of the child.[48] Nevertheless, these matters, being equitable in nature, are left to the sound discretion of the trial court.[49] We uphold such decisions absent a determination that the trial court's decision is clearly against the weight of the evidence so as to constitute an abuse of discretion.[50] The appealing party bears the burden of demonstrating the faultiness of the trial court's decision.[51] An abuse of discretion occurs when a decision is based on an erroneous conclusion of law or where there is no rational basis in evidence for the ruling.[52]

 ¶21 Although it is undisputed that the mother has a long history of mental illness, there is evidence in the record that until she was diagnosed with a seizure disorder and began taking medications for the condition, she had little difficulty parenting and the child was thriving in her care. There is evidence both to indicate that the mother may have physically abused the child by pulling out hair follicles and to refute the same.[53] Such treatment cannot be condoned. Nevertheless, even if the mother was at fault, the record indicates that these actions occurred in 2005 before the mother realized she had problems and sought guardianship by the foster parent. There is evidence that, as recently as 2006, the mother was verbally abusive to a DHS worker and to her child

towards counseling might warrant supervised visitation along with a change in placement; 2) the family counselor expressed concerns that the relationship between BTW and her mother would not improve if the child were not living in a supportive environment and the counselor was unsure that such a situation currently existed; 3) the child reported to the mother's attorney that the foster parent and BTW pray each night that the mother will realize that BTW is not safe, happy or loved with her mother; and 4) the mother is currently without an individual counselor because her doctor has moved but she does want to find another doctor.

47. *Kahre v. Kahre*, see note 49, infra.

48. *Daniel v. Daniel*, see note 49, infra; *Harmon v. Harmon*, 1997 OK 91, ¶15, 943 P.2d 599; *Mueggenborg v. Walling*, 1992 OK 121, ¶9, 836 P.2d 112; *Manhart v. Manhart*, 1986 OK 12, ¶13, 725 P.2d 1234.

49. *Daniel v. Daniel*, 2001 OK 117, ¶21, 42 P.3d 863; *Kahre v. Kahre*, 1995 OK 133, ¶19, 916 P.2d 1355.

50. *Duncan v. Duncan*, 1969 OK 7, ¶13, 449 P.2d 267; *Waller v. Waller*, 1968 OK 42, ¶17, 439 P.2d 952. See also, *Williamson v. Williamson*, 2005 OK 6, ¶5, 107 P.3d 589; *Casey v. Casey*, 2002 OK 70, ¶23, 58 P.3d 763.

51. *Daniel v. Daniel*, see note 49, supra; *Manhart v. Manhart*, see note 49, supra; *Gorham v. Gorham*, 1984 OK 90, ¶14, 692 P.2d 1375.

52. *Spencer v. Oklahoma Gas & Electric Co.*, 2007 OK 76, ¶13, 171 P.3d 890; *Fent v. Oklahoma Natural Gas Co.*, 2001 OK 35, ¶12, 27 P.3d 477; *KMC Leasing, Inc. v. Rockwell–Standard Corp.*, 2000 OK 51, ¶9, 9 P.3d 683; *Abel v. Tisdale*, 1980 OK 161, ¶20, 619 P.2d 608.

53. See, ¶4 and accompanying footnotes, supra.

during a visitation session when she ordered the two out of her home. At the same time, the evidence leaves no doubt that the mother loves her child and has worked to make visitation sessions pleasant and successful.

■ ¶ 22 Evidence in the record supports the mother's contentions that the foster parent has not promoted reunification.[54] On two different occasions, the guardian *ad litem* testified that she felt the foster parent was interfering or negatively influencing the relationship between the mother and BTW.[55] Recognizing the problems that exist in the mother-child relationship, one DHS caseworker acknowledged that it was important to foster the relationship.[56]

¶ 23 The child's major complaints against the mother are that she yells at her, uses foul language, and is interfering in her church activities.[57] The child has clearly expressed her desire to stay in the foster care home. Nevertheless, the fact that BTW believes she might be better cared for by a third party does not justify aborting plans for reunification.[58] Although BTW expresses fear of the mother, she also acknowledges that she has had enjoyable experiences during visitation periods.[59] At least two individuals outside the familial relationship testified they had observed the child with the mother in different settings and that BTW was affectionate towards her mother and was enjoying herself.[60]

¶ 24 There was conflicting testimony and record evidence presented to the trial court on the issue of how BTW's interests could best be served. We have reviewed all the evidence and cannot say that the trial court's findings on visitation, reunification, or change in placement are unsupported by the record or contrary to the child's best interests. The trial court heard all the witnesses, observed them and their respective demeanors. On the record presented, we hold that the judgment of the trial court is not against the clear weight of the evidence so as to constitute an abuse of discretion.[61]

## CONCLUSION

¶ 25 There are no easy answers in this cause and no clear cut lines of demarcation. To date, this mother and daughter have been separated for over three years and each have much to accomplish if reunification is to be successful.

■ ¶ 26 There is conflicting evidence on the crucial issue of the best interests of the child. Nevertheless, discretion is abused, so as to warrant reversal, when a trial judge makes a clearly erroneous conclusion and judgment, against reason and the evidence.[62] A decision reviewed on appeal is presumed correct unless the contrary is shown by the record.[63] Based on our examination of the

---

**54.** A district court has the duty to remove a child from foster care when the situation does not promote an opportunity for reunification. See, *Skrapka v. Bonner,* 2008 OK 30, ¶ 15, 187 P.3d 202; *State ex rel. Dept. of Human Services v. Colclazier,* 1997 OK 134, ¶ 9, 950 P.2d 824.

**55.** See, ¶¶ 6 and 12 along with accompanying footnotes, supra.

**56.** See, ¶ 12 and accompanying footnotes, supra.

**57.** Title 10 O.S. § 7003–8.1 providing in pertinent part:

"A. In placing a child in the custody of an individual or in the custody of a private agency or institution, the court shall, and the Department of Human Services shall, if at all possible, select a person or an agency or institution governed by persons of the same religious faith as that of the parents of the child ..."

**58.** *Kahre v. Kahre,* see note 49, supra. See also, *In re Baby Girl L,* see note 21 at ¶ 41, supra;

*Guardianship of M.R.S.,* 1998 OK 38, ¶ 16, 960 P.2d 357.

**59.** See, ¶ 16 and accompanying footnotes, supra.

**60.** See, ¶ 15 and accompanying footnotes, supra.

**61.** *Duncan v. Duncan,* see note 50, supra; *Waller v. Waller,* see note 50, supra. See also, *Williamson v. Williamson,* note 50, supra; *Casey v. Casey,* note 50, supra.

**62.** *Spencer v. Oklahoma Gas & Electric Co.,* see note 52 at ¶ 28, supra; *Tibbetts v. Sight 'n Sound Appliance Ctrs.,* 2003 OK 72, ¶ 3, 77 P.3d 1042; *Finnell v. Seismic,* 2003 OK 35, ¶ 8, 67 P.3d 339; *Green Bay Packaging, Inc. v. Preferred Packaging, Inc.,* 1996 OK 121, ¶ 32, 932 P.2d 1091; *Broadwater v. Courtney,* 1991 OK 39, ¶ 7, 809 P.2d 1310.

**63.** *In re Baby Girl L,* see note 21, supra; *Enochs v. Martin Properties, Inc.,* 1997 OK 132, ¶ 5, 954 P.2d 124.

record and considering the totality of the testimony and evidence, we determine that the trial court did not abuse its discretion by ordering visitation [64] with a view towards reunification or in directing a change in placement. Therefore, we uphold the trial court's orders.

**AFFIRMED.**

EDMONDSON, V.C.J., HARGRAVE, OPALA, WATT, TAYLOR, COLBERT, REIF, JJ., concur.

WINCHESTER, C.J. and KAUGER, J., dissent.

---

**64.** Only in exceptional cases should visitation be denied to a parent. *Gamble v. Gamble,* 1970 OK 150, ¶ 8, 477 P.2d 383; *Bradford v. Bradford,* 1958 OK 84, ¶ 25, 327 P.2d 684.