2010 OK 69

**In the Matter of BTW, Deprived child under the age of eighteen (18) years.**

**No. 106,865.**

Supreme Court of Oklahoma.

Oct. 5, 2010.

As Revised Oct. 14, 2010.

Jami J. Fenner, Lester, Loving & Davies, P.C., Edmond, OK, for the mother.

Susan K. Meinders, Office of the District Attorney of Woodward County, for the State of Oklahoma.

Careylyn Stuckey Talley, Foard, Talley & Stake, P.L.L.C., Woodward, OK, for the child.

D. Kent Meyers, Harvey D. Ellis, Mary H. Tolbert, Crowe & Dunlevy, P.C., Oklahoma City, OK, for the foster parent.[1]

1. Identified herein are only those counsel for the parties whose names appear on the appellate briefs.

2. *In the Matter of BTW*, 2008 OK 80, 195 P.3d 896. The court affirmed there a February 2008 order of the district court and ruled the trial judge did not abuse his discretion when he ordered (1) a change of child's placement from the current foster home (2) continued visitation between mother and child and (3) the goal to be that of reunification of the child with mother.

3. The child was originally placed in the adoptive mother's home as a foster child. She was approximately 19 months old at the time of her placement. The Department of Human Services (DHS) was aware of the mother's medical history, including mental illness, but was supportive

OPALA, J.

¶ 1 This appeal presses three issues: (1) whether this court's mandate—that affirmed a 2008 trial court order—was ignored by the trial judge's 2009 decision in a post-appeal permanency/review hearing order, (2) did the trial judge abuse his discretion when he ordered (A) the child to remain in the care of the foster parent (B) supervised visitation for the mother and (C) a change of permanency plan to long-term out-of-home child placement and (3) were the mother's due process rights violated when the court ordered long-term foster care for the child. We answer all questions in the negative.

I.

### ANATOMY OF THE LITIGATION

¶ 2 The appeal deals with the post-decisional consequence of an earlier pronouncement by this court, *In the Matter of BTW*.[2] That case shall be referred to as *BTW I*. To provide continuity and assist the reader, a brief recitation of the relevant factual and procedural history leading to our earlier decision and today's cause will be provided here. For a more complete account of the facts leading to *BTW I*, the reader is referred to the opinion in that cause.

### Facts and Procedure Leading to *BTW I*

¶ 3 The mother (appellant in today's cause) adopted BTW in 1999.[3] In June 2005 the mother recognized that her physical and mental abilities to function were deteriorating and that she would need hospitalization. She sought care for BTW from the individual who currently serves as the foster mother.[4]

of the adoption. *BTW I*, *supra* note 2, at ¶ 4, at 899. The child is currently thirteen years old.

We continue the use of generic names for the parties to protect the child's privacy in the spirit of the terms of Rule 1.25, Oklahoma Supreme Court Rules, 12 O.S.2001, Ch. 15, App.1. The pertinent terms of this rule provide:
\* \* \* (b) In appeals from juvenile proceedings including, but not limited to, adoption and paternity proceedings and proceedings under the juvenile code, the initials of the child's name shall be used rather than the child's name. \* \* \*

4. In April 2005, DHS responded to information alleging neglect of BTW. Upon investigation, DHS found neither evidence of neglect nor did it recommend legal action to the district attorney. A "services recommended" finding was entered,

Upon her return home from the hospital, mother alleged the foster mother permitted her only limited supervised visits with BTW. In response to reports of the mother's volatile behavior toward the foster mother, BTW, and a Department of Human Services (DHS) employee, DHS became involved. In May 2006 the child was adjudicated deprived and placed in DHS custody. The agency continued the child's placement with its foster mother. In August 2007, DHS unsuccessfully sought to terminate the mother's parental rights.[5]

¶ 4 Two permanency/review hearings were held. In October 2007, following the first hearing, the trial judge ordered that a different placement be found for the child, all parties to work toward a permanency plan for the child's reunification with her mother and increased visitation with a view to allowing weekend visitations in the mother's home within thirty days.[6]

¶ 5 Although visitation increased, DHS did not find alternative foster placement for BTW. At the second review hearing the foster parent intervened. Following the hearing the trial judge issued an order on 15 February 2008 that again directed a change of foster-home placement, reunification for the permanency plan, and visitation between the mother and her child to continue.[7] The state, child, and foster mother (the appellants in *BTW I* ) immediately filed an emergency motion for the cessation of the mother's visitation rights and a stay of portions of the order. The trial judge denied this motion.[8]

¶ 6 On 25 February the appellants filed in this court an application to assume original jurisdiction, a petition for writ of prohibition, and an application for an emergency stay. The court stayed solely the requested change in foster placement.[9] It assumed original jurisdiction on 18 April and issued a writ prohibiting further proceedings in the case.[10] During this time, the appellants also filed in the district court motions for disqualification of the trial judge[11] and reasonable efforts to

and the mother was to place the child in counseling. *BTW I, supra* note 2, at ¶ 5, at 900.

Although the parties disagree as to who sought a guardianship, one was established in June 2005 with the person who is now the foster mother. *BTW I, supra* note 2, at ¶ 6, at 901.

5. DHS initially sought to terminate mother's rights in 2006. The state's amended petition alleged the mother refused to comply with an earlier treatment plan entered under a disposition order and that her mental condition would not respond to treatment. After a trial, a jury refused to terminate the mother's parental rights. *BTW I, supra* note 2, at ¶¶ 9–10, at 903.

6. After the trial DHS permitted the mother weekly one-hour supervised visitation with the child. In September the mother filed a motion to assume full custody of the child or alternatively to remove the child from the foster parent.

The judge also ordered DHS to expand its search to the three-county area for a home where the faith was different from that of the foster parent, continued counseling for the mother and child and for the mother to execute a release of her medical records. See *BTW I, supra* note 2, at ¶ 13, at 904.

7. At this review hearing DHS had requested reunification efforts cease and the child remain in out-of-home placement. BTW testified she wanted visitations discontinued because she was fearful of her mother and her mother treated her poorly. *BTW I, supra* note 2, at ¶ 15, at 907. The court summarized the child's major complaints against the mother as yelling at her, using

foul language, and interfering with her church activities. *BTW I, supra* note 2, at ¶ 23, at 907. Although BTW expresses fear of the mother, she acknowledges that she has had enjoyable experiences during visitation periods. *BTW I, supra* note 2, at ¶ 23, at 907.

The order further provided that unsupervised weekend visitation was to occur every other weekend and DHS was to advise the court monthly concerning the availability of a new foster-home placement.

8. *BTW I, supra* note 2, at ¶ 16, at 907.

9. The stay was granted only insofar as it related to the child's change of placement from the foster home. The court's order provided "[t]he portion of the trial court's ruling which orders a change of foster placement is temporarily suspended, during the pendency of this original proceeding, or until further order of the court. In all other respects, the Emergency Motion for Stay is denied." (27 February 2008 order, record, p. 1181)

10. In addition to prohibiting further proceedings in the cause the 18 April order (1) retained the cause for disposition by the court and (2) reiterated the stay issued on 27 February should remain in effect pending resolution of the cause. *BTW I, supra* note 2, at ¶ 17, at 907.

11. The appellants' 14 March 2008 motion to disqualify the trial judge urged reasonable doubt about his impartiality. According to appellants

return the child to the home no longer be required, in accordance with the terms of 10 O.S. § 7003–4.6(A).[12]

¶ 7 On 21 April the appellants sought a request to clarify whether the court's writ of prohibition prevents the enforcement of the trial court's order for visitation.[13] Three days later DHS suspended all visitation and appellants filed an emergency motion requesting the court to construe the writ of prohibition as preventing enforcement of the visitation order. This motion was bottomed on reports of the child becoming physically sick following the most recent visitation and allegations that the mother threatened to strangle the child on an earlier weekend visit.[14] The court responded by an order to permit the district court to place for hearing before a disinterested judge the appellants'

motion to discontinue visitation. Following a two-day hearing, a newly-appointed judge ruled supervised visitation to take place not more than once a week.[15] The trial judge's 19 June order noted the incidents leading to the hearing on visitation "were not as horrible as characterized by the child and her supporters nor were they as noncontroversial as was characterized by mother." [16] The court's decision in *BTW I* that affirmed the district court order was issued on 16 September 2008.

### Facts and Proceedings Following *BTW I*

¶ 8 Before mandate issued in *BTW I*,[17] DHS, the child, and foster parent (collectively to be known here as appellees or state) filed an emergency motion to discontinue visitation and request that disclosures of the

---

this was based on (1) *ex parte* communications between the judge and the guardian *ad litem* and (2) the trial judge's change of his opinion about the foster mother, *sans* new evidence. (record, pp. 569–79) The guardian *ad litem* denies any improper communication took place. The trial judge refused to recuse himself and denied the motion. (record, p. 585)

12. This motion was filed on 18 April 2008. (record, p. 720)

13. The state's inquiry was whether the court's earlier 18 April order granting a writ of prohibition preventing further proceedings in this cause also prohibits enforcement of the lower court's order for continuing visitation. If so, they requested to be allowed to seek relief in the district court before a disinterested judge. Although DHS did not subscribe to this motion, it was solely because the responsible attorney was not available to do so. (record, pp. 808–10)

14. The appellants' motion, filed 24 April, was based on reports of mounting stress on BTW as a result of the mother's alleged behavior during recent visitations. Toward the end of a weekday visitation on 23 April, it is alleged the child requested an umbrella before going to an event at the mother's church that she previously had been allowed to attend. The mother refused her permission and is alleged to have begun yelling and using foul language. Later that evening, when mother returned the child to the foster mother at the designated drop-off location, the child became so upset that she vomited. (record, pp. 808–19) This is referred to as the "umbrella incident." According to mother's response to this motion, neither the psychologists nor the guardian *ad litem* were consulted or notified

concerning the termination of visitation. (record, p. 834)

The motion was also based on the child's diary account of events on 6 April, referred to as the Wal–Mart or picture incident. While at Wal–Mart to have pictures of the child made, BTW alleged her mother had threatened to strangle her. The child's diary reveals that she did not want to have her picture taken because she thought her mother would use it in court. (record, p. 819)

Although the appellants' emergency motion to discontinue visitation did not mention an earlier allegation of threat by the mother to choke the child, this was addressed during the June hearing. This occurrence, referenced as the Easter incident, took place on Easter weekend approximately one month before the emergency motion was filed. The alleged statement was made by the mother in response to finding BTW and a friend playing in the mother's closet where she had hidden the child's Easter presents. (transcript of June hearing on visitation, p. 334)

15. 19 June order regarding visitation, record, p. 1052.

16. 19 June 2008 order regarding visitation, record, p. 1050. It was not the trial tribunal's opinion that the mother would be physically violent with the child and the choking allegations "did not appear to be much more than words of frustration or anger." (record, p. 1051) The mother "does not seem to sufficiently recognize the impact of her angry reactions and profane outbursts have on the child nor does she seem to recognize that her reactions and outbursts are fuel for the child's desires and justifications in resisting a relationship with the mother." (record, p. 1051)

17. Mandate issued on 27 October 2008.

court's opinion to the child be limited.[18] This motion was bottomed on a 3 October 2008 report provided by the child's counselor who recommended that visitation with the mother be discontinued because of the child's increased anxiety and deterioration.[19] He also opined to the child's attorney that informing BTW of the court's decision would be harmful to the child.[20] The parties further disagreed on visitation and on which order controlled during this period.[21] Mother sought a contempt citation against DHS, alleging the latter failed to obey the order affirmed by this court.[22]

¶ 9 The trial judge set 25 November for a regular review hearing and to entertain: (1) the state's emergency motion to discontinue visitation and (2) its earlier motion pursuant to 10 O.S. § 7003–4.6(A). The trial judge denied the movants' latter motion *sans* hearing.[23] On 9 February, following a three-day hearing, he ordered (1) the child to remain in the care of the foster parent (2) supervised visitation for mother and child and (3) a change in permanency plan from being promotive of reunification to long-term out-of-home placement. The mother appeals from this order.

18. The motion was filed 10 October 2008.
The state's motion was based upon an 3 October 2008 report from the child's psychologist. (record, p. 1070–75)

19. Report of John Stewart, Ph.D., 3 October 2008, record, p. 1080–81.

20. State's emergency motion for termination of all visitation, record, p. 1072. The therapist who treats both mother and child informed the guardian *ad litem* that the availability of inpatient treatment might be needed upon the child's being informed of the court's opinion that affirmed the trial judge's decision. (letter of Stephen R. Close, Ph.D., record p. 1083)

21. DHS contends the 19 June district court order that provides for supervised visitation once a week has not been abrogated. Mother asserts that order by its own terms determined the visitation to be provided during the pendency of the cause before the court. "The Supreme Court ... directed that a hearing be held by a disinterested judge to determine whether it is proper, during the pendency of the case before the Supreme Court, to allow continued visitation between the Mother and Child." (19 June order regarding visitation, record, p. 1231)

22. At the hearing the judge, noting the motion suffered from a service defect and was based on

## II.

## THE FEBRUARY 2008 ORDER WAS SUBJECT TO REVIEW AND MODIFICATION IF CONDITIONS WARRANT ITS CHANGE

¶ 10 Mother first urges the trial judge erred in his 9 February 2009 order when he failed to enforce this court's 27 October 2008 mandate that affirmed the 2008 trial court's ruling. According to mother, the latter order—that directed a change in foster placement, unsupervised visitation, and the goal of family reunification—was never implemented.[24] Mother asserts this court's order dissolved the temporary stay "instanter." Neither did the intervening 19 June 2008 order—that provides for supervised visitation between mother and child once a week—relieve the trial court of its obligation to comply with this court's decision. According to the mother, the settled-law-of-the-case doctrine—that precludes review of issues decided by an appellate court that have become final in a previous appeal—is applicable to child welfare cases.[25] She urges the contin-

the wrong statute, dismissed mother's original application for citation of contempt. (transcript of November/December 2008 review hearing, p. 6)

23. The judge relied on *In the Matter of C.R.T.*, 2003 OK CIV APP 29, 66 P.3d 1004, and ruled that the time passage, basis and culpability for a determination or granting of the motion had not occurred. (record, pp. 1297)

24. Mother cites the following cases for support of her proposition that it is the duty of the lower court to comply with the mandate. *Hurst v. Brown*, 1954 OK 25, ¶ 7, 266 P.2d 438, 440; *Marshall v. Cantrell*, 1951 OK 172, ¶ 6, 205 Okla. 192, 236 P.2d 262, 263. The district court must implement the mandate of the Supreme Court by entering an order in accordance with the appellate decision. *Take v. Woodruff*, 1931 OK 255, ¶ 3, 150 Okla. 73, 300 P. 698, 699.

25. For support mother cites to *In the Matter of Baby Girl L.*, 2002 OK 9, ¶ 6 n. 2, 51 P.3d 544, 547 n. 2. There the court noted earlier appellate review of the issue of a child's adoption *sans* its father's consent and that the father's parental rights could not be terminated. These conclusions were not before the court on corrective review because of the settled-law-of-the case doctrine. *Baby Girl L., supra.*

ued litigation is due to the appellees' dissatisfaction with the earlier trial judge's ruling[26] and the February 2009 order renders this appellate review meaningless.

¶ 11 The appellees respond the February 2008 order was never more than an interlocutory order. It is hence subject to modification at any time in accordance with the terms of 10 O.S. § 7003–6.1.[27]

 ¶ 12 The goal of inquiry into the meaning of a statutory enactment is to ascertain and give effect to the intent of the legislature.[28] It is presumed that the lawmaking body has expressed its intent in a statute's language and that it intended what it so expressed.[29] If the meaning of a statute is plain and unambiguous, it will not be subjected to interpretation by reference to rules of judicial construction but will instead receive the effect its language dictates.[30] Only if legislative intent cannot be ascertained from the language of a statute, as in cases of ambiguity, are rules of statutory interpretation to be invoked and employed.[31] The de-

termination of legislative intent controls statutory interpretation by the judiciary.[32] When possible, different provisions must be construed together to effect a harmonious whole.[33]

 ¶ 13 The district court's continuing authority over children whose status stands adjudicated as deprived is implicit in the scheme of the Oklahoma Children's Code.[34] The terms of § 7003–6.1 are explicit.[35] *A decree or order made pursuant to the Oklahoma Children's Code may be modified by the court at any time. An order dealing with termination of parental rights is not modifiable.* Further, the legislature has directed that a district court must review every disposition order concerning a child adjudicated as deprived at least every six months.[36] Review hearings may be set at any time upon a motion by any party.[37] The Oklahoma Children's Code, 10 O.S. § 7001–1.1 *et seq.*, is to be liberally construed to carry out its purpose, which includes unifying and strengthening family ties whenever possible

**26.** Mother asserts the movants have made seven attempts to overturn the order of the previously assigned trial judge that provided for visitation and reunification. (mother's response to emergency motion to terminate visitation record, p. 1111)

**27.** The terms of 10 O.S. § 7003–6.1, provide:
Any decree or order made pursuant to the provisions of the Oklahoma Children's Code may be modified by the court at any time; provided, however, that an order terminating parental rights shall not be modified.
All citations in this opinion are to the statutory numbering system used before the time of its change in May 2009.

**28.** *Villines v. Szczepanski*, 2005 OK 63, ¶ 9, 122 P.3d 466, 470; *Cooper v. State ex rel. Dept. of Public Safety*, 1996 OK 49, ¶ 10, 917 P.2d 466, 468.

**29.** *Nealis v. Baird*, 1999 OK 98, ¶ 55, 996 P.2d 438, 460; *TXO Production Corp. v. Okla. Corp. Comm'n*, 1992 OK 39, ¶ 7, 829 P.2d 964, 969.

**30.** *Ross v. Peters*, 1993 OK 8, ¶ 9 n. 17, 846 P.2d 1107, 1119 n. 17; *TRW/Reda Pump v. Brewington*, 1992 OK 31, ¶ 5, 829 P.2d 15, 20; *Forston v. Heisler*, 1961 OK 198, ¶ 11, 363 P.2d 949, 951.

**31.** *Cooper, supra* note 28, at ¶ 10, at 468; *TXO Production Corp., supra* note 29, at ¶ 7, at 969; *Cox v. Dawson*, 1996 OK 11, ¶ 6, 911 P.2d 272, 276.

**32.** *State ex rel. Dept. of Human Services v. Jerry Colclazier*, 1997 OK 134, ¶ 9 n. 13, 950 P.2d 824, 827 n. 13; *Copeland v. Stone,* 1992 OK 154, ¶ 5, 842 P.2d 754, 756; *Fuller v. Odom*, 1987 OK 64, ¶ 5, 741 P.2d 449, 453.

**33.** *McNeill v. City of Tulsa*, 1998 OK 2, ¶ 11, 953 P.2d 329, 332.

**34.** *State ex rel. Dept. of Human Services v. Colclazier, supra* note 32, at ¶ 10, at 828.

**35.** For the terms of § 7003–6.1 see *supra* note 27.

**36.** The terms of 10 O.S. Supp.2007 § 7003–5.6(A), the statute in effect at the time, provide:
Every case regarding a child alleged or adjudicated to be deprived shall be reviewed by the court at a hearing no later than six (6) months from the date of the child's out-of-home placement and at least once every six (6) months thereafter. * * *
*Colclazier, supra* note 32, at ¶ 10, at 828.

**37.** The terms of 10 O.S. Supp.2007 § 7003–5.6(C), the statute in effect at the time, provide:
The court may set a case for a review hearing upon the motion of a party at any time, if the hearing is deemed by the court to be for the health, safety or welfare of the child and in the best interests of the child.
*Colclazier, supra* note 32 at ¶ 10, at 828.

in children's best interest and for the safety and health of children.[38]

■ ¶ 14 The terms of § 7003–6.1 [39] are clear and unambiguous. An order made pursuant to the Oklahoma Children's Code that does not decree parental-rights termination may be modified at any time. The 2009 order appealed from here did not effect termination of parental rights. That order was made in a review hearing in accordance with the terms of § 7003–5.6(C).[40] The state's quest for termination of visitation was sufficient to invoke the court's jurisdiction. The February 2008 order entered by the trial judge and affirmed here was hence subject to review and modifiable if conditions should warrant its alteration.

### III.

**THE TRIAL COURT DID NOT ABUSE ITS DISCRETION WHEN IT ORDERED NO CHANGE IN THE CHILD'S FOSTER HOME PLACEMENT, A LONG–TERM OUT–OF–HOME PERMANENCY PLAN, AND SUPERVISED VISITATION WITH THE MOTHER**

#### A.

**Foster–Home Placement**

■ ¶ 15 The mother next urges the trial judge abused his discretion when he failed to order a change of foster placement, changed the permanency plan from reunification to long-term out-of-home placement, and or-dered supervised visitation. According to the mother, the foster mother's failure to support reunification, the lack of assistance from DHS, and the unflagging litigation brought by the appellants is the primary cause of BTW's anger towards, fear of, and alienation from her. This has served to undermine her relationship with BTW and efforts toward successful visitation and reunification with the child.[41] Motivated by these thoughts, she now urges the trial judge erred when he found the foster mother is acting in the best interest of the child, DHS has attempted to make reunification work, and supervised visitation was proper. The appellees respond there is sufficient evidence to support the trial court's findings.

■ ¶ 16 Abuse of discretion is the standard of review for the conclusion we reach here. When reduced to articulate and meaningful simplicity, abuse of discretion—as a legal standard of appellate review—means exceeding the outer range of permissible judicial choice-making.[42] A trial court's findings concerning visitation and placement of a child previously adjudicated as deprived are matters of equitable cognizance.[43] Its paramount consideration is the best interest of the child.[44] While an appellate court will examine and weigh the record proof, it must abide by the law's presumption that the nisi prius decision is legally correct.[45] It is beyond the appellate court's power to disturb that decision unless it is found to be clearly contrary to the weight of the evidence or to some governing principle of applicable law.[46]

---

38. *Skrapka v. Bonner,* 2008 OK 30, ¶ 19, 187 P.3d 202, 212.

39. For the terms of § 7003–6.1 see *supra* note 27.

40. For the terms of § 7003–5.6(C) see *supra* note 37.

41. The foster mother recently testified at the December 2009 review hearing that she is willing to adopt BTW. (transcript of November/December 2008 review hearing, p. 431)

42. Other definitions of abuse of discretion include: "Abuse of discretion by a trial court is any unreasonable, unconscionable and arbitrary action taken without proper consideration of the facts and law pertaining to the matter submitted." *Harvey v. State,* 1969 OK CR 220, ¶ 9, 458 P.2d 336, 338. "An adjudicator's failure to exercise sound, reasonable, and legal decision-making." BLACK'S LAW DICTIONARY 10 (7th ed.1999).

43. *BTW I, supra* note 2, at ¶ 19, at 908.

44. *BTW I, supra* note 2, at ¶ 19, at 908.

45. *In re Estate of Bleeker,* 2007 OK 68, ¶ 12, 168 P.3d 774, 779.

46. *Ray v. Ray,* 2006 OK 30, ¶ 10, 136 P.3d 634, 636; *In re Estate of Bleeker, supra* note 45, at ¶ 12, at 779. If a trial court's decision stands by record and reason, it will not be disturbed on review. *Hammonds v. Osteopathic Hosp. Founders Ass'n,* 1996 OK 100, ¶ 6, 934 P.2d 319, 322. We have characterized the abuse-of-discretion standard by a variety of similar expressions. We

¶ 17 The record in this appeal is lengthy. Divergent views of the situation and its cause are again pressed by the parties. There is evidence to support the mother's contention. The child, when initially placed with the foster mother, loved and missed her mother.[47] It was shortly thereafter that BTW began to express a fear of her. The court in *BTW I* noted the record evidence supported the mother's contention that the foster mother interferes with the mother-child relationship and does not promote reunification.[48] The court-appointed guardian *ad litem* has consistently held this view ever since her appointment in that capacity in 2005.[49] She has and continues to urge the child be removed from the current foster home because of this factor.[50] Indeed, the close attachment of the

have said that discretion is abused when a trial court makes a clearly erroneous conclusion and judgment contrary to reason and evidence, when it exercises its discretion to an end or purpose not justified by, and clearly contrary to, reason and evidence, and when discretion is employed on untenable grounds or for untenable reasons, or where its exercise is manifestly unreasonable. *State v. Torres*, 2004 OK 12, ¶ 10, 87 P.3d 572, 580.

**47.** Transcript of November/December 2008 review hearing, where the foster mother is testifying on cross examination in pertinent part at pp. 444–45.

Q. "And then on June 26th, you noted that 'She prays every night for her mom to get well so she can go home. She wants to go live with her real family.' Correct?"

A: "Correct."

Q: "And then in the next paragraph, it says 'She seldom asks about mom in the day time now and does not seem sad, only mentions her on occasion, and when we pray even for a meal she prays for mom to get well so she can go home.'"

A: "Correct."

**48.** *BTW I, supra* note 2, at ¶ 22, at 909.

**49.** *BTW I, supra* note 2, at ¶ 22, at 909 and ¶ 17, at 908 n. 46.

Although the foster mother denies influencing the relationship between the mother and child, the guardian's *ad litem* testimony reveals her concerns.

Transcript of November/December 2008 review hearing, Robyn Price, guardian *ad litem*, testifying in pertinent part at p. 633:

"I'm not really trying to offer any new opinions that haven't been said before. As everybody knows, I've always had concerns with the placement with [foster mother]. They've never been anything with [BTW's] physical safety, but it's always been along the lines of whether [foster mother] fostered or encouraged that relationship between [BTW] and her mother."

Transcript of November/December 2008 review hearing, Robyn Price, guardian *ad litem*, testifying in pertinent part at p. 635:

"In addition to the protective order issue between [mother] and [foster mother] and the hostility between these two women—and [BTW] was very aware of that—was the comment—and this was on my very first meeting with [BTW]—that

[foster mother] had told her that her mother had a mental illness and she would never get better. And that was said to me more than once by [BTW]."

Transcript of May/June 2008 hearing on visitation, Robyn Price, *guardian ad litem*, testifying in pertinent part at p. 459:

"And I said, '[BTW], I remember in the guardianship case that you told me that you and [foster mother] would say a prayer for [mother] at night.' And I said, 'Are you guys still saying a prayer at night together?'

And she said, 'Yeah.'

And I said, 'Well, what do you pray about?' or 'Do you pray for [mother]?'

'Yeah, we pray for [mother] to realize that I'm not safe, happy or loved with her.'

And—I mean, it's obvious that the child does not want to be with her mother, have anything to do with her mother."

Transcript of May/June 2008 hearing on visitation, Robyn Price, *guardian ad litem*, testifying on cross examination in pertinent part at p. 458:

"I've had—always had concerns about [BTW's] knowledge and information of the case. I know when [the child's attorney] and I met with her, [BTW] made the statement that 'I do not have to be removed from [foster mother's] home and the court decided Judge Jackson was not the judge anymore.'

And [her attorney] said, 'Well, [BTW], I didn't tell you that, so who told you that?'

And her response was, [foster mother]."

Transcript of May/June 2008 hearing on visitation, Robyn Price, *guardian ad litem*, testifying in pertinent part at p. 469:

The Court: "Okay. I might ask the last question first. Any changes in your opinions that you've developed with reference to this child since this hearing began Friday?"

Ms. Price: "The videotape has impacted some of the thoughts on this. I was—to some extent, I thought the evidence had been presented that there was a rage that went on for two hours with [mother], and what I saw on the videotape, I see [BTW] laughing, I see her playing. I don't see a child that seems to be scared of her mother in that videotape. So that—I guess I've been enlightened by that."

**50.** Transcript of November/December 2008 review hearing, Robyn Price, guardian *ad litem*, testifying on cross examination in pertinent part at pp. 650:

foster mother to the child and the impact of this relationship upon reunification efforts was noted by the current trial tribunal in its June order regarding visitation.[51]

¶ 18 Until the recent visits, upon which the April 2008 emergency motion to terminate visitation was based, the child has been unable to provide specific information about what is stressful about her visits with her mother.[52] BTW has and continues to express her desire that visitations stop and she be allowed to continue to live with her foster mother.[53]

> Q: "Well, if I understand you correctly you're still not changing your opinion that she needs to be removed from [foster mother's] home."
> A: "That's correct."
> Transcript of November/December 2008 review hearing, Robyn Price, guardian *ad litem,* testifying in pertinent part at p. 635.
> "And that's something that I've been consistent on as well: I've never said for her to stay in [the foster mother's] care; I've never said for her to be returned to [the mother]." * * *

51. "[The foster mother] has a close relationship with the child which the child treasures and desires to continue but which could be so close that it does not contribute to a relationship between mother and child. As Dr. Close opined on cross examination, the Foster parent relationship has contributed to difficulties between mother and child. That situation might present itself in any long term relationship between a child and an adult in this situation, the fault perhaps of no one individual." (19 June 2008 order regarding visitation, record, p. 1233)

52. Transcript of May/June 2008 hearing on visitation, Robyn Price, *guardian ad litem,* testifying in pertinent part at p. 464:
"Okay. 'April 30th, 2008: The patient began to accuse this therapist [Dr. Stewart] of being against her. She is unable to be specific about the stressors at her mother's.' "
"[BTW] has had difficulty in being very descriptive of the characteristics about her visits with her mother in describing what makes them so traumatic. However, her report that her mother has difficulty with frustration and becomes agitated easily has been personally witnessed." (2 May 2008 letter of John Stewart, Ph.D., respondent's exhibit 2)

53. November/December 2008 review hearing, transcript, p. 725; May/June 2008 hearing on visitation, in-camera interview by judge of BTW, p. 578; *BTW I, supra* note 2, at ¶ 15, at 907.
The child's attitude toward her mother exhibited during the weekly, one-hour visitations is angry and disrespectful. Transcript of November/December 2008 review hearing, Sue Lougee, DHS Child Welfare Specialist, testifying in pertinent part at p. 257:

¶ 19 The record further reveals the most recent reports and testimony of the *two* treating psychologists—one who works jointly with mother and child and one who works solely with BTW. The child's counselor, although originally concerned about the foster mother's negative impact on the child's relationship with her mother, has since the May/June 2008 hearing on visitation testified that he doesn't now believe the foster mother tries to harm the child's relationship with her mother.[54] The psychologist who jointly treats mother and child, when queried

> Q: "Okay. Overall, what's you opinion on how the visits have gone?"
> A: "[The mother] really makes a sincere effort, I think, to engage [BTW], and she comes in with good ideas for the visits and that type of thing, but [BTW's] response to that effort is usually anger directed at [mother]. Sometimes it has been directed at me for having her—having to bring her there and to keep her there.
> There are times when they do play a game, a board game or a bean toss game, but there's very little really personal interaction between the two. They kind of don't take turns; they just play the game kind of almost, like individually. And so [BTW] usually wants to get out of there as quickly as possible, and she continually asks what time it is, you know, wanting the visit to end. And she will make comments about that, derogatory comments about her mom, to her mom, that type of thing."

54. A 2 May 2008 report from the child's counselor reveals his concern about the foster mother's influence on the child. "Another concern I have developed since the last hearing is the influence that the foster mother plays in [BTW's] relationship with her mother and the role that [foster mother] is playing in contributing to the continued anger [BTW] has towards her mother. [BTW] has indicated that [foster mother] does not promote the development of a relationship but has instead has possibly contributed to the anger and anxiety that [BTW] has. It is recommended that if [BTW] is to remain in [foster mother's] home, [foster mother] should be counseled as to the importance of promoting a positive relationship with her mother...." (November/December 2008 review hearing, respondent's exhibit 2)

> Transcript of 30 May of the May/June 2008 hearing on visitation, John Stewart, Ph.D., testifying on cross examination in pertinent part at p. 69:
> Q: "Did your questions relate to a connection between placement and visitation?"
> A: "I was concerned at the time that [BTW's] views about her mom and her negative view of her mother and just her overall negative perception was related to her—could be related to her

whether this was a case of parental alienation, testified he did not have sufficient information to make that determination.[55]

¶ 20 According to both counselors, BTW has a genuine fear of her mother and of being returned to the latter's care.[56] Her adamant opposition to visitation and possible reunification with her mother impacts their interactions.[57] According to the family counselor, the mother, while having made earnest efforts to moderate her behavior and improve the situation, believes BTW's fears of her are more displays for effect and not genuine concerns.[58] She is unable to find an effective means of responding to or handling the child's behavior.[59] Her anger and foul language frighten the child.[60] The child's therapist recommends that efforts toward reunification cease.[61] The counselor for mother and child reports the current therapeutic efforts are unproductive.[62] Because of the deficiencies in the parent-child bond, less far-reaching goals would currently be more

placement. I didn't know. I'm not saying it was. Since then, I think I've come to the place—I've come to an understanding that I don't think that it is."
Q: "And what changed your mind?"
A: "In talking with [BTW] and in—I haven't worked with [foster mother] over the last six months, but she's brought her. I means, she's brought her the majority of the times. I don't believe—one of the questions I had—and Ms. Price has brought this up—is that [foster mother] doesn't promote a relationship with her mom. And I don't know if she does or not, but I don't think she tries to harm that relationship either. And I think [foster mother] is sincerely concerned about [BTW] and is concerned about her safety and her—and that's why she' so invested in her. And that's just what I've come to understand."
The guardian *ad litem* noted Dr. Stewart's opinion concerning the foster mother's influence on the child had changed since her conversations with him the previous month. Transcript of 30 May of the May/June hearing on visitation, Robin Price, guardian *ad litem*, at pp. 454–56.

**55.** Transcript of November/December 2008 review hearing, Stephen R. Close, Ph.D., testifying on cross examination in pertinent part at p. 65:
Q: "Would you say that you have a serious case of parental alienation on your hands?"
A: "Well, it depends how you use that term."
Q: "Okay."
A: "Because if you're using that with respect to parent alienation as conceptualized in divorce proceedings, then no. I mean, I don't have the amount of information necessary to make that kind of determination."

**56.** Report of Stephen Close, Ph.D., 10 November 2008, record, p. 1495.
Transcript of May/June 2008 hearing on visitation, Stephen R. Close, Ph.D., testifying in pertinent part at p. 127:
Q: "Did [BTW] tell you that she was fearful?"
A: "Yes, she did."
Q: "Do you believe her fear is contrived?"
A: "No."
Q: "On a scale of 1 to 10, how would you rate [BTW's] fear?"
A: "Oh, I think 7 or 8."

Transcript of May/June 2008 hearing on visitation, John Stewart, Ph.D., testifying in pertinent part at p. 45:
Q: "Do you believe that [BTW] is truly afraid of her mother?"
A: "Yes"
Q: "An on a level of 1 to 10, what do you believe [BTW's] level of fear of [mother] is?
A: "An 8 or 9."

**57.** Report of Stephen R. Close, Ph.D., 10 November 2008, record, p. 1494.

**58.** Report of Stephen R. Close, Ph.D., 10 November 2008, record, p. 1495.

**59.** Report of Stephen R. Close, Ph.D., 10 November 2008, record, p. 1494.

**60.** Transcript of November/December 2008 review hearing, Stephen R. Close, Ph.D., testifying in pertinent part at pp. 49–50:
Q: "Okay. You testified in May as to some flashes of anger that [mother] had that created an emotional risk to [BTW]."
A. "Yes."

**61.** Report of John Stewart, Ph.D., 3 October 2008, record, p. 1491.

**62.** Report of Stephen R. Close, Ph.D., 10 November 2008, record, p. 1495. Report of John Stewart, Ph.D., 3 October 2008, record, p. 1492.
Transcript of November/December 2008 review hearing, Stephen R. Close, Ph.D., testifying in pertinent part at p. 46:
Q: "Can you tell me what those factors that are interfering with treatment are?"
A: "Well, from [BTW's] standpoint, I think that she has difficulty with attachments. That's been covered before. I think that the strength of attachment with [mother] after their separation has been very, very low, very, very little. And from [mother's] standpoint, I think it's very difficult for [mother] to be able to tap into [BTW's] emotional state and her emotional needs. As a result, [BTW] is not—doesn't really have a meaningful bond with [mother], and [mother's] difficulties in really understanding and reaching [BTW] emotionally then effectively interferes with building that bond."

appropriate.[63]

▮ ¶ 21 A district court has the duty to remove a child from foster care when the circumstances do not promote an opportunity for reunification.[64] Although there is conflicting evidence here concerning whether the foster mother supports family reunification, we cannot say the trial tribunal's decision to continue the child's placement in the current foster-home was clearly contrary to the weight of the evidence. The mother and child have attended joint and individual counseling sessions for almost a year. Unfortunately, little progress towards establishing a healthy parent-child bond has been made. Both counselors believe the child's fear of the

mother is genuine. Further, they now advise that to continue the current therapeutic efforts may be injurious to the child's functioning.[65] Additionally, testimony from teachers and the child's school counselor support the notion that the child is progressing well in school and socially.[66] She feels secure in her current foster-home placement.[67] In light of record evidence, we cannot hold that the trial court abused its discretion when it ordered no change in foster-home placement.

## B.

### Permanency Plan

▮ ¶ 22 The mother next urges the trial judge abused his discretion when he changed

**63.** Report of Stephen R. Close, Ph.D., 10 November 2008, record, p. 1495.

Transcript of November/December 2008 review hearing, Stephen R. Close, Ph.D., testifying in pertinent part at p. 51:

Q: "In your observations of [mother] and [BTW] in your sessions, is it your opinion that a different environment might lend a different outcome at this point?"

A: "Well, I—yeah, this has come up before, and I've talked to [mother] about this as well, that [BTW] has a fear that if things go well between she and [mother] that that would speed reunification. And so the kind of onus of having this potential change in custody causes [BTW] to not only be chronically worried, but she's wary of anything that would indicate that progress was being made, and, therefore, that it would be likely to speed being reunified . . ."

**64.** *BTW I, supra* note 2, at ¶ 22, at 909 n. 54 (citing *Skrapka, supra* note 38, at ¶ 15, 187 P.3d 202, 210; *Colclazier, supra* note 32, at ¶ 9, at 829).

The mother asserts that because the foster mother does not allow for the opportunity to effect reunification, the district court failed to consider BTW's long-term best interests when it ordered her to remain in the foster mother's home in accordance with 10 O.S. §§ 7003–5.6d(B) and 7003–5.6(F)(2)(a) & (F)(5).

**65.** Transcript of November/December 2008 review hearing, Stephen R. Close, Ph.D., testifying in pertinent part at pp. 48–49:

Q: "In spite of your recommendation that the joint counseling stop, do you see any danger to [BTW] if the sessions with you were to continue?"

A: "Well, conceivably, yes."

Report of John Stewart, Ph.D., 3 October 2008, record, p. 1491.

**66.** Transcript of November/December 2008 review hearing, Lisa D. Ross, teacher, testifying in pertinent part at pp. 500:

Q: "How does [BTW] do in your class?"
A: "She does very well."
Q: "And how does she get along with her peers?"
A: "Very well."

Transcript of November/December 2008 review hearing, Tara Burnett, school counselor, testifying in pertinent part at p. 479:

Q: "How is [BTW] functioning currently when you see her?"
A: "I think she's doing fine."
Q: "So—"
A: "Academically, I think she's doing fine"

**67.** Transcript of November/December 2008 review hearing, Stephen R. Close, Ph.D., testifying on cross examination in pertinent part at pp. 63:

Q: "Okay. Do you think if we changed the foster placement that things would just be better, that [BTW's] and [mother's] interaction together would be significantly better?"

A: "Well, that raises a whole host of issues about alliances and loyalties and so on. Like I said before, the way that I would tend to reason through that is that it's going to be an emotional expense to [BTW] to move away from people that she identifies as loving and caring. If we were to do that, then we'd want to know that we had some gain that would outweigh the costs of making that move."

Transcript of November/December 2008 review hearing, Sue Lougee, DHS child welfare specialist, testifying in pertinent part at p. 264:

Q: "What is your recommendation on [BTW] being moved?"

A: "I don't know if the Court's gonna like me to say this, but I think that's ludicrous.
* * * When children—growing up, a child, one of the things that make a healthy child is the stability of a caretaker and a physical home where they live where they can feel safe. If you move [BTW], she's gonna have to start all over. She's gonna have to gain trust. She's not gonna really know a lot of people again. You're gonna lose everything that she has if she's moved."

the permanency plan from reunification to long-term, out-of-home placement. According to the mother, the trial judge erred when he determined the state has made reasonable efforts to reunify this family.[68] She asserts there has been no legitimate opportunity for reunification because of improper foster placement, obstructive and delayed actions by DHS, and inadequate visitation, at times limited to one hour per week. Further, DHS has and continues to interfere with her rights to make educational, healthcare, and religious-training decisions for BTW, and the only reunification services it is providing are foster care and visitation.

¶ 23 The mother's argument must fail in light of the record before us. The trial judge's February 2009 order does reflect some tension exists between the mother and DHS staff. "[I]t is the position of the court that the DHS should make every effort to facilitate visitation that is more successful than in the past and supervised by persons and in places that are more conducive to pleasant circumstances." (9 February 2009 order, p. 5) Although the mother asserts efforts by DHS dealing with reunification are meager, she does not identify any required services the state has failed to provide her. The evidence reveals the state is providing foster care, conducting monthly visits of the foster home, arranging and supervising visitation sessions, talking with providers, and facilitating some transportation for the child's visits with her mother.[69] Further, the mother and child have attended court-ordered counseling. We cannot say the trial judge abused his discretion when he found the state had made reasonable efforts toward reunification.[70]

68. According to the mother the state is obligated to make reasonable efforts to reunify the family. 10 O.S. § 7003–5.3(J); 42 U.S.C. § 671(a)(15). The trial judge must have failed to consider prior evidence pursuant to 10 O.S. § 7003–5.6(F)(4). According to the mother, she is compliant with her service plan and she is not at fault for the time BTW has been out of the home.

69. Transcript of November/December 2008 review hearing, Sue Lougee, DHS child welfare specialist, at p. 263 and 308.

70. The mother contends the foster mother was never a proper placement for the child and that the terms of 10 O.S. §§ 21.1 and 7004–1.5(B)(1)(b)—dealing with order of placement preference—were ignored by the court in the earlier guardianship case and by DHS in its placement of BTW. The trial judge determined that although the child's grandmother was a willing kinship placement, the evidence indicated she never completed a proper application and was rejected by DHS for that reason. (9 February 2009 order, p. 5) The mother in her reply brief, p. 15. note 6, further urges DHS ignored the terms of § 7003–8.1(A) which require DHS to select a placement for the child with the same religious faith as the parents. The § 7003.8.1(A) terms state that "the court shall, and the Department of Human Services shall, *if at all possible*, select a person or an agency or institution governed by persons of the same religious faith as that of the parents of the child ..." (emphasis supplied) Concerning the child's religious education, the record reveals that BTW attends a church that is neither the foster mother's church nor the mother's preferred church. According to the DHS worker this is so because (1) the mother did not respond to her after their initial discussion of this issue (2) the foster parent made this arrangement and (3) her understanding of the earlier court order permits the mother to direct the child's religious education when she is with her. (November/December hearing review hearing, Sue Lougee, DHS child welfare specialist, testifying, p. 301–02) (exhibit 17, 3 March 2008 DHS letter).

The mother's argument—that the trial court violated Title II of the Americans with Disabilities Act (ADA) by failing to direct the development of a treatment and service plan that included additional services for BTW and herself—was denoted as an issue to be raised on appeal in her amended petition in error. Because the mother does not in her briefs make specific arguments concerning ADA provisions, this issue stands abandoned.

The mother next urges the state cannot fail to make reasonable efforts to unify the family and then urge "exceptional circumstances" exist as a basis for determining long-term out-of-home placement as the proper permanency plan. For support she cites to *Matter of A.S.*, 1991 OK CIV APP 44, ¶ 24, 811 P.2d 910, 915–16; *Matter of C.R.T.*, 2003 OK CIV APP 29, ¶ 33, 66 P.3d 1004; and *Matter of G.C.*, 1996 OK CIV APP 131, 928 P.2d 974, 978 n. 4. The terms of 10 O.S. Supp. 2007 § 7003–5.6(F)(1)(d), the provision in effect at the time, provide:

F. At each review hearing the court shall:
1. Determine whether:
* * *
(d) the child, because of exceptional circumstances, should remain in long-term out-of-home placement as a permanent plan or with a goal of independent living:
* * *
The mother's argument is bottomed on the premise that the state failed to make reasonable efforts to reunify this family. This premise is

¶ 24 The mother further urges that it was error for the trial judge to fail to order a modification in the treatment and service plan following the November/December 2008 review hearing, in conformity to the terms of 10 O.S. § 7003–5.6(F)(6).[71] Neither was a new treatment plan filed nor did the court provide the mother with a description of conduct that is expected of her to alleviate the conditions that resulted in the child's removal from her home in conformity to the terms of §§ 7003–5.3(B) [72] and 7003–5.3(D)(5)(d).[73]

¶ 25 The § 7003–5.3 terms deal with the initial service plan implemented by the district court. It is subject to modification by the § 7003–5.6 terms that deal with periodic review hearings.[74] Our review of the § 7003–5.6(F)(6) terms reveals that it is with-

unsupported upon review and the argument hence fails.

The mother further contends the trial judge erred when he decided that reunification is not a realistic goal in this case. He erred when he considered Dr. Stewart's opinion because (1) the latter offered an opinion yet was acting in the dual role—that of a therapist as well as being in a forensic role and (2) he rendered an opinion about an individual *sans* a formal assessment or having substantial contact with the person. This, according to the mother, is an ethical prohibition in accordance with OAC 575:10–1–10(b), that adopted the ASPPB Code of Conduct, Section III(A)(6). Appellate brief, p. 28. We note this is an ethical argument, not a legal one. According to the mother, the trial court further erred when it considered the testimony of appellees' third expert witness, Dr. Barbara Bonner. The latter had no contact with the parties but offered her opinion of the situation based on her review of the reports and testimony of the treating psychologists and related portions of the trial court record and transcripts. According to the mother, neither experts' testimony meets the Daubert factors for admissibility and cites *Christian v. Gray*, 2003 OK 10 ¶ 7, 65 P.3d 591, 597 (adopting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)). Both psychologists possess specialized knowledge that assists the trier of fact to understand the evidence. The mother is not specific concerning which of "their theories have not been tested, published, or do not have widespread acceptance." Appellant's brief, p. 28. We cannot say the trial judge erred when he considered this testimony.

The mother further urges that reasonable efforts to return the child to her home are required unless one of the enumerated bases set forth in 10 O.S. § 7003–4.6 is present. Because none of these bases is present here, according to the mother, reunification is the required plan. The mother is mistaken. A settled rule of statutory construction requires that, when possible, different provisions must be construed together to effect a harmonious whole. (see *infra* part II) The trial court rested its decision on the § 7003–5.6(F)(1)(d) terms, which provide for long-term out-of-home placement because of exceptional circumstances.

The mother's final assertion is that the trial judge erred by abandoning reunification as the permanency plan before it was attempted. The

terms of § 6.1 provide that a decree or order pursuant to the Oklahoma Children's Code may be modified at any time. See section II of this opinion, *infra*.

71. The terms of 10 O.S. Supp.2007 § 7003–5.6(F)(6), the statute in effect at the time, provide in pertinent part:

> F. At each review hearing the court shall:
> * * *
> 5. Order such modification to the existing individual treatment and service plan as the court determines to be in the best interests of the child and necessary for the correction of the conditions that led to the adjudication of the child.

72. The terms of 10 O.S. Supp.2006 § 7003–5.3(B), the terms in effect at the time, provide:

> The plan shall be filed by the Department of Human Services or the agency responsible for the supervision of the case, or by the Department or the agency or licensed child-placing agency having custody of the child if the child has been removed from the custody of its lawful parent or parents.

73. The terms of 10 O.S. Supp.2006 § 7003–5.3(D)(5)(d), the terms in effect at the time, provide:

> D. The individual treatment and service plan shall include, but not be limited to:
> * * *
> 5. If the child is placed outside the home:
> * * *
> d. the services necessary to assist the child to reintegrate with the child's family or other community-based placement and a description of acts by and conduct that is expected of the parent or parents, legal guardian, custodian, or stepparent or other adult person living in the home that would alleviate the conditions that resulted in the removal of the child before the child can be returned to a safe home.

74. The authority of DHS to determine a child's placement is confined by the guidelines of §§ 7003–5.3 and 7004–1.1, for determination of individual treatment and service plans, and subjected to approval, disapproval, or modification by order of the district court in §§ 7003–5.5 and 7003–5.6 disposition and review proceedings. *Colclazier, supra* note 32 at ¶ 12, at 829.

in the trial tribunal's discretion to modify the existing treatment plan. It is not mandatory that the plan be changed at each hearing but it stands subject to modification as the court determines to be in the best interests of the child. When this is so, a new plan is not required. We hence cannot say the trial judge's failure to order a modification of the existing treatment plan constitutes reversible error.

¶ 26 Lastly, the mother contends the trial judge violated her due process rights when he changed the permanency plan from family reunification to long-term, out-of-home placement.[75] According to mother, an order providing for long-term foster care and limited supervised visitation is a significant restriction of her parental rights.[76] The mother relies on In the Matter of Baby Girl L.[77] and asserts that because the alleged harm here is psychological in nature, it is "serious psychological harm" to the child that must be shown before her parental rights may be restricted.[78]

¶ 27 The mother's reliance on Matter of Baby Girl L. is mistaken. That cause dealt with the return of a child to its biological parents after a failed adoption. The court there held that prospective adoptive parents should be allowed to make a showing of serious psychological harm to a child resulting from a change in custody from adoptive parents to the biological parent after a lengthy period of a failed adoption. If this showing has been made, a trial court may award custody to a party other than a biological parent. The court's decision there was bottomed on the state's adoption statutes.[79] It is inapplicable here.[80]

¶ 28 In that cause the court reiterated that concern about actual or imminent harm to the child is the legislature's standard in terminating or restricting parental rights.[81] The mother urges the trial tribunal made no finding that the mother's actions would result in harm to BTW. According to the mother, by restricting her rights without this finding the trial court denied her due process. There is evidence here that reveals the child's functioning has deteriorated and if efforts toward reunification were to continue further deterioration may result in the child's mental health functioning.[82] This finding is

75. According to the mother it is a denial of her due process rights to not be reunited with her daughter based on factors outside of her control—the passage of time and the acts of the State and foster parent. The trial judge's decision was not bottomed on passage of time. There is sufficient evidence to support the trial court's ruling concerning the actions of the State and foster mother.

76. York v. Halley, 1975 OK 51, ¶ 9, 534 P.2d 363, 365, teaches that failure to schedule a hearing for nearly two months after depriving the parents of the custody of their children is an impediment to the continuation of the parent-child relationship and a denial of due process.

77. In the Matter of Baby Girl L., supra note 25, at ¶ 12, at 550.

78. Mother argues there was neither evidence to support a finding of serious psychological harm nor a witness, including the psychologists, who stated they could predict what may happen if BTW is moved from [foster mother's] home. In essence she urges there was no evidence presented to a "reasonable psychological certainty" that the mother would cause harm to the child. Appellant's reply brief, p. 12–13.

79. In the Matter of Baby Girl L., supra note 25, ¶ 29, at 557. The Oklahoma Legislature has enacted that after a failed adoption the child should not automatically be returned to the child's biological parents because a serious psychological harm to a child may occur in a particular case. In the Matter of Baby Girl L., supra at ¶ 24, at 556.

80. Even if the phrase "serious psychological harm" were applicable here, the court acknowledged the phrase did not lend itself to precise definition. In the Matter of Baby Girl L., supra note 25, at ¶ 31, at 556.

81. Oklahoma's legislature has used imminent or actual harm to a child as a basis for terminating or restricting parental rights. Matter of Baby Girl L., supra note 25, at ¶ 26, at 556 (citing In the Matter of J.N.M, 1982 OK 153, 655 P.2d 1032 and 10 O.S. Supp.2000 § 7003–4.6(A)(9), (preservation of a family is not required if a court determines that an abandonment has occurred that constitutes a serious danger to the health and safety of the child)). Substantive due process forbids termination of such fundamental rights in the absence of a demonstration of a compelling state interest in the form of specific findings of existing or threatened harm to the child. Matter of J.N.M., supra.

82. Transcript of November/December 2008 review hearing, John Stewart, Ph.D., testifying in pertinent part at p. 139–140.
 "Due to the continued determination of [BTW] that is related to her contact with her mother

sufficient as a basis for actual or imminent harm. The mother's due process rights were hence not violated when the trial judge ruled long-term out-of-home placement of the child was proper.

## C.

### Visitation

¶ 29 The mother's final claim to error is that no factual basis exists to deny her unsupervised visitation. Neither is there evidence that suggests BTW will be harmed by the mother or by unsupervised visitation. Further, she urges her fear that has already been instilled in BTW will only be reinforced by requiring supervised visitation. Although there is evidence to support each side's position on appeal, we cannot say the trial tribunal erred when it ordered supervised visitation of the mother with the child. The counselors have testified that the child's fear of her mother is genuine. One counselor has recommended that visitations cease and the other questions the advisability of unsupervised interactions between the mother and child.[83] The trial judge did not hence err when he ordered supervised visitation.

## IV.

### SUMMARY

¶ 30 We review the trial court's resolution of fact issues under the centuries-old equitable standard. It is our duty to affirm the trial court's decree if it is not clearly contrary to the weight of the evidence. Our careful review of the massive record reveals that although there is conflicting evidence, we cannot say the trial judge abused his discretion (or that his findings are clearly

and her current level of distress when with her mother, it is recommended that visitations be stopped."
\* \* \*
"The second recommendation was 'Due to the lack of progress that has been made with the reunification attempt and the level of distress that continued attempt has on [BTW], it is recommended that reunification attempts be terminated. If these attempts continue, it is likely that [BTW] will continue to deteriorate and her mental health functioning may become severely limited.' "

contrary to the weight of the evidence) when he ordered the child to remain in her current foster-home environment as a long-term, out-of-home placement and permanency plan, and enjoy supervised visitation with her mother. The trial court's order must be and hence is affirmed.

¶ 31 EDMONDSON, C.J., TAYLOR, V.C.J., HARGRAVE, OPALA, KAUGER, WATT, WINCHESTER AND REIF, JJ., CONCUR;

¶ 32 COLBERT, J., CONCURS IN PART AND DISSENTS IN PART.

Q. "Are those still you recommendations, or have your recommendations changed?"
A. "No, those are still my recommendations."

83. "Considering the emotional distance between these individuals and the difficulty interacting meaningfully in a structured and protected setting such as a therapy session, there is reason for even greater concern regarding the nature and outcome of prolonged interactions in an unsupervised setting." Report of Stephen R. Close, Ph.D., 10 November 2008, record, p. 1495.